**GREAT AMERICAN INSURANCE COMPANY, Appellant,**

v.

**NORTH AUSTIN MUNICIPAL UTILITY DISTRICT NO. 1, Appellee.**

No. 3–92–182–CV.

Court of Appeals of Texas, Austin.

March 31, 1993.

Rehearing Overruled May 5, 1993.

Published in Part Pursuant to Tex.R.App.P. 90.

---

Arthur F. Selander, Godwin & Carlton, P.C., Dallas, for appellant.

Scott R. Kidd, Brown McCarroll & Oaks Hartline, Austin, for appellee.

Before CARROLL, C.J., and JONES and KIDD, JJ.

JONES, Justice.

## I. INTRODUCTION

The North Austin Municipal Utility District No. 1 ("MUD"), appellee, filed suit against Great American Insurance Company ("Great American"), appellant, Underground Utilities Company ("Underground Utilities"), Dippel Ulmann & Associates, Inc. ("Dippel Ulmann"), and Smith Pump Company, Inc. ("Smith Pump"), alleging that the defendants had used a defective component in the construction of a waste-water system for MUD. Following a jury trial, the trial court rendered judgment in

favor of MUD and against all four defendants.

Great American is the only defendant that perfected an appeal from the trial court's judgment. On appeal, Great American attacks the judgment on the basis of (1) the determination of Underground Utilities' underlying liability, from which Great American's liability derives; (2) the charge submitted to the jury; (3) the applicability of article 21.21 of the Insurance Code, Tex. Ins.Code Ann. art. 21.21 (West 1981 & Supp.1993); (4) the sufficiency of the evidence to support the jury's findings for violations of article 21.21 and the exclusion of evidence pertinent to Great American's defense to MUD's claims under article 21.-21; (5) the award of attorney's fees; and (6) the inclusion of prejudgment interest as part of MUD's actual damages for purposes of trebling such damages. We will affirm the judgment of the trial court.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This suit involves a project for the construction of the Rattan Creek Lift Station, a waste-water lift station. Underground Utilities was the general contractor for the project; Dippel Ulmann was the engineer; Smith Pump was a subcontractor; and Great American was the construction surety, furnishing both performance and maintenance bonds on behalf of Underground Utilities, its principal, and in favor of MUD, its obligee.

The lift station at issue in the present case consisted of a wet well/dry well configuration. Under this system, both the wet well and dry well are buried in the ground. The wet well is fabricated out of poured concrete and serves as a collection tank for waste water delivered by local gravity pipe lines. The dry well consists of a prefabricated metal container and houses the pumping equipment used to pump the water from the wet well into a force main pipe system.

Before advertising for bids on the project, MUD requested Dippel Ulmann (then known as Carlson & Dippel, Inc.), which was under contract to provide engineering services for MUD, to assess the feasibility of refurbishing and relocating an existing dry well owned by MUD that was scheduled to be taken out of service. After receipt of Dippel Ulmann's initial research, MUD authorized Dippel Ulmann to proceed. Dippel Ulmann then drafted plans and specifications for the construction project. The plans did not indicate any specific requirement for the thickness of the sides for the dry well. In addition, the specifications merely required that the thickness of the sides be sufficient "for the depth of burial."

MUD advertised for bids and requested that bidders provide alternative bids: one for a newly constructed dry well and the other for the refurbishment and relocation of the existing dry well. The bid package included the plans and specifications prepared by Dippel Ulmann. There was no indication in the bid package that the plans and specifications would be varied if the bid were awarded based on the refurbishment alternative. In August 1987, Underground Utilities was awarded the contract on the basis of its bid of approximately $360,000 for the refurbishment and relocation of the existing lift station. Great American then issued a performance bond on behalf of Underground Utilities and in favor of MUD.

Underground Utilities hired Smith Pump as a subcontractor to refurbish the existing dry well. Smith Pump submitted shop drawings to Dippel Ulmann, the engineer, indicating the manner in which it proposed to refurbish the existing lift station. The shop drawings did not indicate that Smith Pump would thicken the sides of the dry well. Dippel Ulmann approved the drawings and Smith Pump performed the work in conformity with the drawings. The refurbished dry well was then delivered to Underground Utilities. The project was completed, and the lift station was activated in April 1988. MUD accepted the project as substantially complete in December 1988.

The contract between MUD and Underground Utilities provided for a one-year correction period after MUD's acceptance

of the project. This provision required Underground Utilities to correct or replace any defective work. In connection with Underground Utilities' obligation under this provision, Great American as surety issued a one-year maintenance bond in favor of MUD.

On March 10, 1989, MUD discovered a structural deformity in the "shell" of the dry well: one of the sides was beginning to collapse. Based on an investigation by a structural engineer, MUD concluded that the collapse was occurring because the sides of the dry well were not of sufficient thickness for the depth of burial. MUD requested Underground Utilities to make repairs pursuant to the correction-period provision of the contract. Underground Utilities refused to make any repairs, claiming that (1) it had performed all work in accordance with the plans and specifications; (2) Dippel Ulmann had approved the work; (3) MUD had accepted the work; and (4) Smith Pump was liable under its manufacturer's warranty for the deformity.

MUD then informed Great American that the dry well was suffering from a structural deformity and that Underground Utilities had refused to make repairs. MUD demanded that Great American perform under the terms of its maintenance bond. Great American responded that the structural defect was the result of a design defect for which Underground Utilities was not liable under the terms of the contract. On that basis, Great American asserted that it was not liable under the terms of the bond. Great American did not take any action to effect repairs or make any payments to MUD to cover the cost of repairs.

MUD filed suit, asserting various claims against Underground Utilities, Dippel Ulmann, Smith Pump, and Great American. The jury found that all four defendants were liable; that Great American had knowingly engaged in "unfair or deceptive act[s] or practice[s]"; that MUD's actual damages were $411,400; and that reasonable attorney's fees were one-third of the amount of MUD's recovery. After adding prejudgment interest, the trial court trebled the combined damage sum, awarding MUD a total of $1,558,804.80 in damages and $779,402.40 in attorney's fees against Great American. Great American, as sole appellant, asserts twenty-four points of error complaining of the trial court's judgment. We will group the points of error and address each in the following order: (1) Excused Liability; (2) Jury Charge; (3) Applicability of Article 21.21; (4) Evidence of Article 21.21 Violations; (5) Attorney's Fees; and (6) Prejudgment Interest.

## V. APPLICABILITY OF ARTICLE 21.21

■ The trial court rendered judgment based on the jury's findings that Great American engaged in unfair or deceptive acts or practices and failed to deal with MUD fairly and in good faith. In point of error seventeen, Great American argues that the trial court erred in rendering judgment against it because article 21.21 of the Insurance Code, Tex.Ins.Code Ann. art. 21.21 (West 1981 & Supp.1993), does not apply to commercial sureties. The main thrust of Great American's argument is that a commercial surety is not engaged in the "business of insurance" for purposes of article 21.21 and, therefore, Great American could not have violated this provision. We disagree.

The purpose of article 21.21 is to "regulate trade practices in the business of insurance." Tex.Ins.Code Ann. art. 21.21, § 1(a) (West Supp.1993). Article 1.14–1 of the Code defines those acts which constitute "doing an insurance business" and expressly includes the following: "The making of or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety." Tex.Ins.Code Ann. art. 1.14–1, § 2(a)(2) (West Supp. 1993).

■ Conceding that its activities fall within the scope of the definition in article 1.14–1, Great American asserts three arguments why this definition should not apply to article 21.21. First, Great American argues that neither article refers to the other

or incorporates the other's definitions. We see no reason, however, to assign different meanings to the phrase "doing an insurance business" in article 1.14–1 and the phrase "business of insurance" in article 21.21. Significantly, neither article *excludes* the definitions of the other. Had the legislature intended to exclude sureties from regulation under article 21.21, it could have done so as it has in other provisions of the Code. For example, article 21.55 applies to "any insurer authorized to do business as an insurance company," Tex.Ins. Code Ann. art. 21.55, § 1(4) (West Supp. 1993), but specifically excludes "fidelity, surety or guaranty bonds," Tex.Ins.Code Ann. art. 21.55, § 5(a)(4) (West.Supp.1993). Clearly, the legislature is capable of drawing such distinctions where it deems necessary.[7]

Second, Great American argues that the definition in article 1.14–1 should not apply to article 21.21 because the purposes of the statutes are different. Great American argues that article 1.14–1 "seeks to define those general business activities which are subject to the overall jurisdiction of the State Board of Insurance," while article 21.21 "seeks to regulate specific activities related to the 'business of insurance' which the legislature has deemed to be unfair or deceptive." This is no real distinction. Article 1.14–1 identifies the "business of insurance" subject to regulation, and article 21.21 specifically regulates trade practices in the business of insurance, prohibiting unfair and deceptive practices. Accepting Great American's argument would allow sureties to be "regulated" as entities engaged in the business of insurance, yet would make it impossible to prohibit them from engaging in unfair or deceptive practices while conducting this business. We reject this illogical construction.

Third, Great American argues that federal case law should control our interpretation of article 21.21's reference to the "business of insurance." Section 1 of article 21.21 states that "[t]he purpose of this Act is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in [15 U.S.C.A. §§ 1011 to 1015]." We do not believe our analysis is inconsistent either with the purpose of the Insurance Code as expressed in article 21.21 or with the intent of Congress as expressed in the referenced sections of the United States Code.

Although we have been unable to find any decision directly addressing whether article 21.21 applies to sureties, one court recently held (without analysis) that an obligee under a commercial surety bond was entitled to recover damages from a surety for violations of article 21.21. *See Lawyers Sur. Corp. v. Royal Chevrolet, Inc.,* 847 S.W.2d 624, 629–30 (Tex.App.—Texarkana 1993, writ requested). We overrule point of error seventeen.

## VII. ATTORNEY'S FEES

■ In points of error twenty-one through twenty-three, Great American complains of the trial court's award of attorney's fees to MUD. In question seventeen, the jury was asked to determine MUD's attorney's fees, if appropriate, stated as a percentage of recovery. In response to this question, the jury answered 33⅓ percent.

■ In point of error twenty-one, Great American complains that the evidence is legally or factually insufficient to support the jury's finding to question seventeen. Article 21.21 permits the recovery of "reasonable and necessary attorneys' fees." Tex.Ins.Code Ann. art. 21.21, § 16(b)(1) (West Supp.1993). The party seeking to recover attorney's fees carries the burden of proof on this issue. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991). Attorney's fees may not be awarded, however, unless supported by

---

**7.** Other activities excluded under article 21.55, § 5 fall within the scope of article 21.21. *See Aetna Casualty & Sur. Co. v. Marshall,* 724 S.W.2d 770 (Tex.1987) (workers compensation insurance); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1 (Tex.1991) (title insurance). Logi-

cally, the intent of the legislature in excluding particular activities from regulation under article 21.55 was to exclude activities that would otherwise be considered within the scope of the Insurance Code.

sufficient evidence. *Fairmont Homes, Inc. v. Upchurch,* 704 S.W.2d 521, 525 (Tex.App.—Houston [14th Dist.]), *modified & aff'd,* 711 S.W.2d 618 (Tex.1986).

At trial, MUD relied on the testimony of two witnesses as evidence to support its claim for attorney's fees. Sharlene Collins, general counsel for MUD, testified that MUD engaged counsel on the basis of a contingent-fee contract which specified a 33⅓ percent contingency fee. This contract was admitted into evidence. Further, Mark Perlmutter, MUD's expert witness, testified that the contingent-fee arrangement in this case was a reasonable and customary fee, "but it's on the low side."

Great American does not controvert this testimony. Rather, it claims that this evidence is insufficient to support the award because there was no evidence presented that would allow the jury to properly evaluate the reasonableness of the award, e.g., there was no evidence presented regarding preparation in connection with the case, the novelty or difficulty of the issues involved in the case, or the level of skill required to effectively try the case. Great American cites several cases as authority for its argument; however, the cases cited are distinguishable. In three of the four cases, there was no evidence that a contingency contract existed between the parties. *See Fairmont Homes,* 704 S.W.2d at 526; *Wisznia v. Wilcox,* 438 S.W.2d 874, 879 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n.r.e.); *Smith v. Davis,* 453 S.W.2d 340, 347 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n.r.e.). In the remaining case, *Brown v. De La Garza Service Center, Inc.,* 576 S.W.2d 134, 136 (Tex.Civ.App.—Waco 1978, no writ), no evidence whatsoever was presented; rather, the award of attorney's fees was based on judicial notice of the reasonableness of the fees requested.

In contrast, MUD presented evidence that a contingent-fee contract existed, submitted the contract into evidence, and presented testimony that the particular contract was reasonable. This uncontroverted evidence was both legally and factually sufficient to support the award of attor-

ney's fees. *See, e.g., Kerrville HRH, Inc. v. City of Kerrville,* 803 S.W.2d 377, 388 (Tex.App.—San Antonio 1990, writ denied); *March v. Thiery,* 729 S.W.2d 889, 897 (Tex.App.—Corpus Christi 1987, no writ); *Hochheim Prairie Farm Mut. Ins. Ass'n v. Burnett,* 698 S.W.2d 271, 278 (Tex.App.—Fort Worth 1985, no writ); *Liberty Mut. Ins. Co. v. Allen,* 669 S.W.2d 750, 755 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). Accordingly, we overrule Great American's twenty-first point of error.

 In point of error twenty-two, Great American complains that the trial court erred in overruling its objection to question seventeen because such question permitted the jury to award attorney's fees without segregating those fees among the various defendants and various causes of action. As a general rule, when a party seeks to recover attorney's fees in a case involving multiple defendants or multiple causes of action, the party is required to segregate its request for fees among the various defendants and various causes. *Stewart Title Guar. Co.,* 822 S.W.2d at 10–11; *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.,* 739 S.W.2d 622, 625 (Tex.App.—Dallas 1987, writ denied). An exception to this rule, however, allows a party to forgo segregating fees where the claims arise out of the same transaction and are so interrelated that the prosecution or defense requires proof or denial of essentially the same facts. *Stewart Title Guar. Co.,* 822 S.W.2d at 11. As the Texas Supreme Court explained, "when the causes of action involved in the suit are dependent on the *same set of facts or circumstances* and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Id.* (emphasis added).

Great American argues that the claims against the four defendants were "distinct causes of action which required the proof of distinct sets of facts." As support for this proposition, Great American argues that "[t]he claims asserted against Dippel Ulmann, Underground Utilities and Smith

Pump, all related to breach of common law or contractual duties relating to the construction of the lift station. In contrast, the claims asserted against Great American involved alleged duties to reasonably and expeditiously evaluate MUD's bond claim." We disagree and conclude that all claims relied on the same set of facts. As Great American itself argued under its excused-liability and jury-charge points of error, its own liability stems from Underground Utilities' underlying liability. In other words, MUD was required to prove its case against Underground Utilities in order to recover from Great American. As a result, the same facts were at issue. We overrule Great American's twenty-second point of error.

 In point of error twenty-three, Great American complains that the trial court erred in granting attorney's fees to MUD in an amount exceeding the jury's answer to question seventeen. The trial court awarded MUD $779,402.40 in attorney's fees. Great American argues that this amount constitutes 50 percent of the $1,558,804.80 in damages MUD recovered from Great American, rather than the 33⅓ percent found by the jury to be a reasonable fee.

The contingent-fee contract expressly provides that attorney's fees would be calculated as "33⅓% of the *recovery*," not the *damages*, and MUD's expert witness testified that this arrangement was reasonable. Based on the evidence, the jury found 33⅓ percent of MUD's *recovery* to be a reasonable attorney's fee. The amount a plaintiff is entitled to recover under article 21.21 is "the amount of actual damages *plus court costs and reasonable and necessary attorneys' fees*. If the trier of fact finds that the defendant knowingly committed the acts complained of, the court shall award, in addition, two times the amount of actual damages." Tex.Ins.Code Ann. art. 21.21, § 16(b)(1) (West Supp.1993). MUD's *recovery* in this case, therefore, is treble damages *plus* a reasonable attorney's fee. In order to enter a proper judgment, the court must calculate the total amount of recovery so that after one-third of that total is allocated to attorney's fees, the remaining sum equals the statutorily-required treble damages. Any other method of calculating attorney's fees would result in awarding the plaintiff either less than the 33⅓ percent fees found by the jury, or less than the treble-damages award required by the statute. We conclude that the trial court did not err in calculating MUD's attorney's fees. Accordingly, we overrule Great American's twenty-third point of error.

## IX. CONCLUSION

We affirm the judgment of the trial court.