GREAT AMERICAN INSURANCE
COMPANY, Petitioner,

v.

NORTH AUSTIN MUNICIPAL UTILITY
DISTRICT NO. 1, Respondent.

No. D–3889.

Supreme Court of Texas.

Argued Jan. 19, 1995.

Decided June 15, 1995.

Rehearing Overruled Nov. 16, 1995.

**416**

David C. Wenholz, Dallas, Arthur F. Selander, Dallas, for petitioner.

Scott R. Kidd, Austin, for respondent.

OWEN, Justice, delivered the opinion of the Court in which all the Justices join.

The issues in this case involve the duties and liabilities of a commercial surety to its bond obligee. We hold there is no common law duty of good faith and fair dealing between the surety and the bond obligee comparable to that between a liability insurer and its insured. We further hold that article 21.21 of the Insurance Code is inapplicable to a commercial surety, and accordingly, reverse the judgment of the court of appeals in part. 850 S.W.2d 285, 902 S.W.2d 488.[1] We affirm the holding of the court of appeals that the surety in this case is liable under the terms of the bond for the default of the principal.

I

This case arises out of a construction project for a municipal wastewater lift station in which Great American Insurance Company ("Great American") issued payment, performance, and maintenance bonds in favor of the North Austin Municipal Utility District No. 1 ("MUD"). In 1986, MUD determined that it needed to upgrade a wastewater lift station located at Rattan Creek to consist of a wet well/dry well configuration. A wet well is a concrete structure poured into the ground which serves as a holding tank for the wastewater being collected by the sta-

---

1. Only part of the court of appeals' decision was published pursuant to Texas Rule of Appellate Procedure 90. Because we consider issues that were disposed of in unpublished portions of that opinion, the entire opinion is ordered published by this Court.

tion, while a dry well is a large, metal cylinder buried in the ground which contains the pumps and electrical equipment necessary to pump wastewater. In planning the facility at Rattan Creek, MUD considered two alternatives: the construction of a new dry well or the refurbishment and relocation of an existing dry well at another lift station that was to be closed.

MUD consulted with an engineering firm, Dippel Ulmann, who prepared bid documents that requested contractors to submit separate bids for the construction of a new dry well and for the refurbishment of the existing well. The specifications, plans, and drawings included in the bid documents, however, were the same for either project and did not contain requirements specifically related to the refurbishment of the existing dry well. The specifications required the thickness of the sides of the dry well to be determined by the structural requirements for the depth of burial, but at a minimum to be ¼ inch thick.

Underground Utilities Company ("Underground") was awarded the contract on the basis of its bid for the refurbishment and relocation of the existing dry well. Underground removed the dry well and shipped it to a subcontractor, Smith Pump Company, for refurbishment. Smith Pump submitted drawings indicating the manner in which it would refurbish the dry well to Dippel Ulmann, who approved them. The drawings did not include any indication that Smith Pump would thicken the sides of the dry well. After the modifications were completed, the dry well was installed at Rattan Creek and began operating in April of 1988. MUD formally accepted the refurbished lift station as "substantially complete" in December, 1988.

On March 10, 1989, nearly one year after being installed at Rattan Creek, the metal sides of the dry well collapsed inward by approximately three inches. MUD notified Underground and retained a structural engineer to evaluate the cause of the failure. Although the sides of the dry well met the minimum ¼ inch thickness required by the contract specifications, the engineer determined that the sides were nonetheless not thick enough to withstand the lateral earth pressure created by the depth of burial of the well.

MUD demanded that Underground correct the problem. Underground refused, claiming that it had performed all work according to the plans and specifications approved by MUD's design engineer and that MUD had approved the work. Underground further claimed that Smith Pump, rather than Underground, was liable on the warranty included in the contract documents. Smith Pump denied liability for the inward buckling of the dry well, asserting that an outside force caused the buckling, and pointing out that the dry well was in place at its previous location for over three years without buckling inward and had been operating at Rattan Creek for nearly one year.

On April 4, 1989, MUD first sent notice of the defect to the construction surety, Great American, who had issued a performance bond in the amount of $397,503.20 and a one-year maintenance bond in the amount of $386,431.98 on the project. MUD advised Great American of Underground's refusal to correct the problem with the dry well, and demanded performance under the terms of the bonds.

Thereafter, Great American consulted with MUD and Underground about the problem, obtained copies of the report of MUD's engineer, and reviewed copies of the contract documents and specifications. On April 26, 1989, Great American sent a letter to MUD stating that the problem with the dry well appeared to be one relating to its design, and requested evidence that its principal, Underground, had failed to conform with the plans and specifications in the contract. Great American also asked MUD for legal authority holding a contractor liable for an engineering design defect. MUD replied several months later by sending a letter demanding payment on the bonds. Great American once again responded by requesting additional information. The dry well continued in operation during this time.

MUD filed suit against Dippel Ulmann, Smith Pump, Underground, and Great American. Based on liability findings by a jury against all the defendants, the trial court

rendered judgment in favor of MUD. Specifically as to Great American, the jury found that it had knowingly committed deceptive acts in violation of article 21.21 of the Insurance Code and had breached a common law duty of good faith and fair dealing. The jury also found that reasonable attorneys' fees would be 33⅓% of MUD's recovery. Accordingly, based on an actual damages finding by the jury of $411,400, the court entered judgment against Great American by adding prejudgment interest to that amount and trebling that sum under article 21.21, § 16(b) for damages in the amount of $1,558,804.80. The court additionally awarded $779,402.40 in attorneys' fees against Great American. Great American alone appealed the judgment of the trial court, and the court of appeals affirmed.

## II

The jury found that Great American failed to deal fairly and in good faith with MUD and that the amount of damages proximately caused by this failure was $411,400. Great American contends that the court of appeals erred in failing to hold that the contractual relationship between a commercial surety and its bond obligee does not give rise to a common law duty of good faith and fair dealing. In response, MUD asserts that the special relationship between a surety and its obligee justifies the judicial imposition of this extracontractual duty.

In *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983), this Court held that a duty of good faith and fair dealing does not exist in the context of all contractual relationships. Such a duty is owed by a liability insurer to its insured, however, because of the special relationship between them. *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987). Likewise, this duty is owed by workers' compensation carriers to injured workers. *Aranda v. Insurance Co. of N. Am.,* 748 S.W.2d 210, 212–13 (Tex.1988). At issue, then, is whether the relationship between a surety and its bond obligee is such that it owes a duty of good faith and fair dealing to the bond obligee.

In finding a special relationship between a liability insurer and its insured, factors this Court has considered include unequal bargaining power between the insurer and its insured, the nature of insurance contracts (which permit unscrupulous insurers to take advantage of insureds' misfortunes in negotiating claim resolution), and the insurance company's exclusive control over the claim evaluation process. *Arnold,* 725 S.W.2d at 167. None of these factors is present in this case.

First, the unequal bargaining power that concerned this Court in *Arnold* did not exist here. Great American had no control over the form of the bond used in this case. In fact, state law, which required a contractor entering into a formal contract in excess of $25,000 with any governmental or quasi-governmental authority to provide both performance and payment bonds in favor of the governmental entity, mandated that the form of the required bonds "shall be approved by the Attorney General" or the "governmental awarding authority concerned." TEX.REV. CIV.STAT.ANN. art. 5160, *repealed by* Acts 1993, 73rd Leg., R.S., ch. 268, § 46(1), 1993 Tex.Gen.Laws 583, 986 (current version at TEX.GOV'T CODE § 2253.021(e)). MUD therefore had the ability to exercise control over the form of the bonds. Moreover, the bonds incorporated the terms of the contract between MUD and Underground. It is undisputed that MUD controlled the contract documents at issue here.

Second, concerns that a surety may take advantage of a bond obligee in the claims resolution process ignore the fundamental differences between a liability insurance contract and a surety bond. While a liability insurance contract involves only two parties, the insurer and the insured, suretyship involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to supplement an obligation of the principal owed to the bond obligee. Clark, *Suretyship in the Uniform Commercial Code,* 46 TEX.L.REV. 453 (1968). Unlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indemnity to the insured for loss, the obligation of a surety to a bond obligee is secondary to the obligation

owed by its principal. A party sustaining a loss covered under a liability insurance contract can look only to its insurer for recourse. A bond obligee has a remedy against its principal.

Another significant distinction between sureties and an insurer is that sureties traditionally are entitled to rely upon all defenses available to their principal as to the debt owed to the bond obligee. *See Wright Way Constr. Co. v. Harlingen Mall Co.,* 799 S.W.2d 415, 426 (Tex.App.—Corpus Christi 1990, writ denied) (liability of surety is derivative in nature and depends upon principal's liability); *Stephens v. First Bank & Trust of Richardson,* 540 S.W.2d 572, 574 (Tex.Civ. App.—Waco 1976, writ ref'd n.r.e.) ("A surety or guarantor can assert any defense to a suit on a note available to the principal."); *Scarborough v. Kerr,* 70 S.W.2d 607, 607 (Tex.Civ.App.—Beaumont 1934, no writ) (any plea by a principal which would release it from liability on a bond releases the surety); *Girard Fire & Marine Ins. Co. v. Koenigsberg,* 65 S.W.2d 783, 786 (Tex.Civ.App.—Dallas 1933, no writ) ("Unless a cause of action exists against the principal, it cannot exist against the surety."). Indeed, the Texas Business and Commerce Code expressly allows a surety to *require* a bond obligee to sue upon a written contract before the surety is liable. TEX.BUS. & COM.CODE § 34.02. Under section 34.02, if a bond obligee who has received written notice from a surety requiring it to sue upon the contract fails to prosecute a suit to judgment and execution, the surety's liability on the contract may be discharged. *Id.*[2] Imposing a common law duty on a surety because it is allegedly in a position to delay paying claims could directly contravene a surety's express statutory right to require an obligee to file suit against the principal, obtain a judgment, and execute on that judgment.

Great American has not invoked section 34.02 of the Texas Business and Commerce Code, and we do not address its application to the facts of this case. An argument could be made that the parties to a bond may expressly exclude a surety's rights under section 34.02. We do not reach that issue. The pertinent point is that recognition of a common law duty comparable to that in *Arnold* and *Aranda* would be inconsistent with rights available under section 34.02 to sureties.

We recognize that some jurisdictions have imposed a duty of good faith and fair dealing upon commercial sureties in favor of bond obligees. *See, e.g., Dodge v. Fidelity & Deposit Co.,* 161 Ariz. 344, 346–47, 778 P.2d 1240, 1242–43 (1989); *Board of Directors of Ass'n of Apartment Owners of the Discovery Bay Condominium v. United Pac. Ins. Co.,* 77 Hawai'i 358, 884 P.2d 1134, 1137 (1994); *Szarkowski v. Reliance Ins. Co.,* 404 N.W.2d 502, 504–06 (N.D.1987). However, the imposition of the duty of good faith and fair dealing in these cases generally is premised on the conclusion that suretyship is insurance under the applicable state statutes or case law. For example, in *Dodge,* the court held that because suretyship was specifically listed as a type of insurance in two different state statutes, the legislature intended to include suretyship within the coverage of insurance statutes. *Dodge,* 161 Ariz. at 346, 778 P.2d at 1242. Because that court found the legislative intent to be clear, it explicitly refused to consider the inherent differences between suretyship and insurance. *Id.* The court then concluded that as insurers, sureties owe the same duty to act in good faith as other insurers. *Id.* But see *Tacon Mechanical Contractors, Inc. v. Aetna Cas. & Sur. Co.,* 860 F.Supp. 385, 388 (S.D.Tex.1994), concluding that there is no special relationship

---

**2.** Specifically, section 34.02 provides

 (a) When a right of action has accrued on a contract for the payment of money or performance of an act, a surety on the contract may require by written notice that the obligee forthwith sue on the contract.

 (b) A surety who gives notice to an obligee under Subsection (a) of this section is discharged from all liability on the contract if the obligee

 (1) is not under a legal disability; and either

 (2) fails to sue on the contract during the first term of court after receiving the notice, or during the second term showing good cause for the delay; or

 (3) fails to prosecute the suit to judgment and execution.

TEX.BUS. & COM.CODE § 34.02.

between a bond obligee and a payment bond surety and that such a surety does not owe a common law duty of good faith and fair dealing akin to that in *Arnold*.

We conclude in section III, *infra*, that the Texas Legislature did not intend to include suretyship as the "business of insurance" for all purposes under the Insurance Code. The differences between suretyship and insurance merit consideration, and we therefore find the reasoning of *Dodge* and similar cases unpersuasive. *United Pac. Ins. Co.*, 884 P.2d at 1137 (assuming without discussion that sureties owe duty of good faith in reliance on *Dodge*); *Szarkowski*, 404 N.W.2d at 504–06 (holding without discussion that compensated sureties should be treated as insurers and that all insurers owe a duty of good faith and fair dealing).

■ The contract between MUD and Underground in this case was an arm's length transaction, entered into after an open bidding process. No special relationship between MUD and Underground exists. The derivative nature of a surety's liability and its right to rely upon the defenses of its principal compel the conclusion that a surety, like its principal, should be entitled to test the merits of an obligee's claim without the imposition of extracontractual duties to the bond obligee. This Court has held that a surety bond is subject to "the common law of contracts, which is not punitive in nature." *State v. Alpha Oil & Gas, Inc.*, 747 S.W.2d 378, 379 (Tex.1988). We therefore hold that Great American did not owe a common law duty of good faith and fair dealing to MUD.

### III

■ Great American next contends that the court of appeals erred in holding that article 21.21 of the Texas Insurance Code applies to commercial sureties.

Article 21.21 of the Insurance Code creates a private cause of action for injuries caused by practices declared to be "unfair or deceptive" in section 4 of article 21.21, the rules

and regulations of the State Board of Insurance adopted under article 21.21, or section 17.46(b) of the Texas Deceptive Trade Practices Act. Tex.Ins.Code art. 21.21, § 16; *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 147 (Tex.1994). The action may be maintained against "the person or persons engaging in such acts or practices." Tex.Ins.Code art. 21.21, § 16. For purposes of article 21.21, the term "person" means "any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, *and any other legal entity engaged in the business of insurance*, including agents, brokers, adjusters and life insurance counselors." *Id.* § 2(a) (emphasis added). The "business of insurance" has never been defined in article 21.21; however, the version of article 21.21 that is applicable to this case declared that its purpose was

> to regulate trade practices in the business of insurance in accordance with the intent of Congress of March 9, 1945 (Public Law 15, 79th Congress), by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

Acts 1985, 69th Leg., R.S., ch. 22, § 1, 1985 Tex.Gen.Laws 395, 395, *amended by* Acts 1993, 73rd Leg., R.S., ch. 685, § 20.17, 1993 Tex.Gen.Laws 2559, 2704 (current version at Tex.Ins.Code art. 21.21, § 1(a)).[3]

Our primary goal in construing article 21.21 is to give effect to the intent of the Legislature. *Monsanto v. Cornerstones Mun. Util.*, 865 S.W.2d 937, 939 (Tex.1993). When a statute is unambiguous, a court generally must seek the intention of the legislature as found in the plain and common meaning of the words and terms used. *Republic-Bank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex.1985).

---

**3.** The reference in this section to the "Act of Congress of March 9, 1945" is to 15 U.S.C. §§ 1011–1015 (1945), popularly known as the McCarran–Ferguson Act. Section 1 of article 21.21 was amended after this case was filed to

delete the reference to the McCarran–Ferguson Act. Acts 1993, 73rd Leg., R.S., ch. 685, § 20.17, 1993 Tex.Gen.Laws 2559, 2704 (current version at Tex.Ins.Code art. 21.21, § 1(a)).

In keeping with this rule, chapter 312 of the Texas Government Code, which deals with the rules of construction for civil statutes, directs us to give words their ordinary meaning, *unless* such a word is connected with and used with reference to a particular trade or subject matter, in which case it shall have the meaning given by experts in that particular trade. TEX.GOV'T CODE § 312.002. The phrase "business of insurance" refers to a particular trade, permitting us to consider the meaning of the phrase as used by "experts in the trade." Further, chapter 312.005 of the Government Code directs that a court interpreting a statute shall attempt to ascertain the legislative intent and "shall consider at all times the old law, the evil, and the remedy." *Id.* § 312.005. Therefore, in determining whether the phrase "business of insurance" as used in article 21.21 includes commercial suretyship, we consider the legislative history of the Insurance Code.

Great American argues that the Legislature did not intend commercial suretyship to be included within the business of insurance regulated by article 21.21. It contends that the phrase "to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the [McCarran–Ferguson Act]" indicates that the Legislature intended federal law under the McCarran–Ferguson Act to control the definition of the business of insurance as used in article 21.21. Great American contends that the definition of the business of insurance under federal law is very narrow and is limited to those contracts which involve the spreading and underwriting of a policyholder's risk. *See Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979). Suretyship is not insurance, the argument runs, because it does not involve the spreading of a bond holder's risk.

The McCarran–Ferguson Act was passed by Congress in 1945 in response to *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), in which the United States Supreme Court held that the business of insurance involves interstate commerce. *Royal Drug Co.*, 440 U.S. at 217, 99 S.Ct. at 1076. The decision in *United States v. South–Eastern Underwriters Association* cast some doubt on the constitutionality of state regulation and taxation of the insurance industry under the Commerce Clause. Congress reacted quickly to preserve state regulation of the activities of insurance companies. *Royal Drug Co.*, 440 U.S. at 217–18 nn. 16–18, 99 S.Ct. at 1076–77 nn. 16–18. Thus, the primary concern of Congress, reflected in sections 1 and 2(a) of the Act, was to enact legislation that would assure that the states have the ability to tax and regulate the business of insurance. *Id.* Sections 1 and 2(a) of the McCarran–Ferguson Act operate to assure that states are free to regulate insurance companies without fear of attack under the Commerce Clause. *Id.* at 218, 99 S.Ct. at 1076. A secondary concern was the applicability of antitrust laws to the insurance industry, which Congress resolved by providing that antitrust laws would be applicable to the business of insurance only to the extent such business is not regulated by state law. *Id.* at 218–20, 99 S.Ct. at 1076–78.

Given this background, it is clear that the Legislature's expressed intent in article 21.21 to "regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the [McCarran–Ferguson Act]" is to utilize the broad grant of power to the states under sections 1 and 2(a) of the McCarran–Ferguson Act to regulate the business of insurance free from challenges under the Commerce Clause of the United States Constitution. The reference to the McCarran–Ferguson Act is an attempt to exercise this grant of power, not to narrow the scope of the regulations. While federal case law may have narrowly construed the "business of insurance" for purposes of determining if a particular activity is exempted from the antitrust laws, these cases have no application to the protection afforded state regulation from attack under the Commerce Clause. *See Royal Drug Co.*, 440 U.S. at 218 n. 18, 99 S.Ct. at 1077 n. 18. Therefore, we are unpersuaded by the argument that the Legislature's reference to the McCarran–Ferguson Act evidences its intent to incorporate a definition of the business of insurance under federal antitrust law in article 21.21.

MUD argues that the Legislature's intended definition of the phrase "business of insurance" as used in article 21.21 can be found in article 1.14–1 of the Insurance Code, which lists acts that constitute the "doing of an insurance business" and includes certain contracts of suretyship.[4] The court of appeals agreed, finding it significant that article 21.21 did not specifically exclude suretyship from its scope. Great American concedes that its surety activities constitute the "doing of an insurance business" under article 1.14–1, section 2(a). It contends vigorously, however, that article 1.14–1 has no application to the scope of activities regulated by article 21.21 and points out that article 1.14–1 was enacted after article 21.21.

An overview of the legislative history of the Insurance Code is instructive in resolving this issue. The Code was enacted in 1951, with a preamble stating

> An Act arranging the Statutes of this State affecting the business of insurance in appropriate Chapters and Articles into a consistent whole and under a single Code; making such editorial changes that are necessary to that accomplishment; preserving the substantive law as it existed immediately before the passage of this Act....

Acts 1951, 52nd Leg., R.S., ch. 491, 1951 Tex.Gen.Laws 868, 868. The 1951 codification "was merely a formal revision" with little substantive change to the various statutes which it repealed and reorganized. Goodrum and Gordon, *Substantive Law Revision in Texas,* 37 Tex.L.Rev. 740 (1959). The new Code did not contain a definition of "the business of insurance" anywhere within its provisions. Portions of the Code did refer to suretyship: the Code provided for a Board of Insurance Commissioners, one of whom was

to have "general supervision of matters relating to casualty, motor vehicle, workmen's compensation, fidelity, guaranty, title, and miscellaneous insurance." Acts 1951, 52nd Leg., R.S., ch. 491, § 1, 1951 Tex.Gen.Laws 868, 869 (current version at Tex.Ins.Code art. 1.02). Article 7 (now repealed) specifically regulated fidelity, guaranty, and surety companies. Acts 1951, 52nd Leg., R.S., ch. 491, § 1, 1951 Tex.Gen.Laws 868, 955, *repealed by* Acts 1957, 55th Leg., R.S., ch. 388, § 1, 1957 Tex.Gen.Laws 1162, 1162.

Although the 1951 codification included article 21.21, the statute then primarily concerned anti-discrimination practices. In 1957, article 21.21 was amended to regulate unfair methods of competition and unfair or deceptive acts or practices in the business of insurance. Acts 1957, 55th Leg., R.S., ch. 198, § 1, 1951 Tex.Gen.Laws 401, 401. The phrase "business of insurance" remained undefined by that article or any other in the Code. Significantly, the predecessor to section 34.02 of the Texas Business and Commerce Code, which explicitly granted sureties the right to give notice to a bond obligee that it must prosecute a suit on the underlying written contract to judgment and execution, was in effect when article 21.21 was amended to regulate against unfair and deceptive practices. *See* Tex.Rev.Civ.Stat.Ann. arts. 6244, 6245, *repealed by* Acts 1967, 60th Leg., R.S., ch. 785, § 4, 1967 Tex.Gen.Laws 2608, 2619 (current version at Tex.Bus. & Com.Code § 34.02). For the same reasons discussed in Part II, there would be tension between section 34.02 of the Business and Commerce Code and article 21.21 of the Insurance Code if the latter were applicable to sureties.

In 1967, the Legislature added article 1.14–1 to the Code. Article 1.14–1 is titled "Unauthorized Insurance" and its avowed

---

4. Specifically, the applicable version and portions of article 1.14–1 state

> Sec. 2. (a) Any of the following acts in this State effected by mail or otherwise is defined to be doing an insurance business in this state.... Unless otherwise indicated, the term insurer as used in this Article includes all corporations, associations, partnerships and individuals engaged as principals in the business of insurance and also includes interinsurance exchanges, mutual benefit societies, and insurance exchanges and syndicates as defined by

> rules promulgated by the State Board of Insurance.
> 1. The making of or proposing to make, as insurer, an insurance contract.
> 2. The making or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety....

Acts 1987, 70th Leg., R.S., ch. 254, § 1, 1987 Tex.Gen.Laws 1573, 1573 (current version at Tex. Ins.Code art. 1.14–1, § 2(a)).

purpose is "to subject certain persons and insurers to the jurisdiction of the State Board of Insurance, of proceedings before the Board, and of the courts of this state in suits by or on behalf of the state and insureds or beneficiaries under insurance contracts." Acts 1967, 60th Leg., R.S., ch. 185, § 1, 1967 Tex.Gen.Laws 401, 401 (current version at Tex.Ins.Code art. 1.14–1, § 1).[5]

Section 1 of article 1.14–1 catalogues the concerns that the Legislature intended to remedy by its enactment, which primarily include the protection of state residents from the acts of unauthorized insurers, the protection of state tax revenues, and the provision of a local forum in which state residents may confront unauthorized insurers. *Id.* To address these concerns, the Legislature provides for substituted service of process on unauthorized insurers, and "in doing so exercises its power to protect residents of this state and to define what constitutes doing an insurance business in this state...." *Id.*

Nowhere in the "purpose" clause of article 1.14–1 did the Legislature indicate that the list of acts contained therein which constitute "doing an insurance business" was to apply throughout the Code. Rather, the purpose clause of article 1.14–1 points out that in defining "what constitutes doing an insurance business," the Legislature was exercising its power to address its explicitly listed concerns. The expressed concerns do not evidence an intention to promulgate a uniform definition of the acts which constitute doing an insurance business; rather, they indicate concern that particular parties may escape the jurisdiction of the State Board of Insurance and evade suit by contractual beneficiaries. We cannot conclude that the enactment of article 1.14–1 altered the scope of the term "business of insurance" as it was used in article 21.21. In fact, in the same legislative session that article 1.14–1 was enacted, the Legislature formally codified Texas Revised Civil Statute articles 6244 and 6245 as section 34.02 of the Business and Commerce Code, thereby reaffirming the right of a surety to require its obligee to file suit against its principal. *See* Acts 1967, 60th Leg., R.S., ch. 785, § 1, Tex.Gen.Laws 2608, 2608. (Again, we do not reach the question of whether the terms of a specific bond may exclude this statutory right, and specifically, whether the performance bond at issue here did so.)

In any case, while the Legislature collected the statutes relating to insurance and arranged them into a "consistent whole" in 1951, the collection presented little substantive change. Goodrum, *supra* at 743. The Code is not a result of the Legislature's continuing statutory revision program of the state's civil statutes that has resulted in such codes as the Business and Commerce Code

5. Section 1 of article 1.14–1 in its entirety states

The purpose of this Article is to subject certain persons and insurers to the jurisdiction of the State Board of Insurance, of proceedings before the Board, and of the courts of this state in suits by or on behalf of the state and insureds or beneficiaries under insurance contracts. The Legislature declares that it is a subject of concern that many residents of this state hold policies of insurance issued by persons and insurers not authorized to do insurance business in this state, thus presenting to such residents the often insuperable obstacle of asserting their legal rights under such policies in forums foreign to them under laws and rules of practice with which they are not familiar. The Legislature declares that it is also concerned with the protection of residents of this state against acts by persons and insurers not authorized to do an insurance business in this state by the maintenance of fair and honest insurance markets, by protecting the premium tax revenues of this state, by protecting authorized persons and insurers, which are subject to strict regulation, from unfair competition by unauthorized persons and insurers and by protecting against the evasion of the insurance regulatory laws of this state. In furtherance of such state interest, the Legislature herein provides methods for substituted service of process upon such persons or insurers in any proceeding, suit or action in any court and substitute service of any notice, order, pleading or process upon such persons or insurers in any proceeding before the State Board of Insurance to enforce or effect full compliance with the insurance and tax statutes of this state, and declares in doing so it exercises its power to protect residents of this state and to define what constitutes doing an insurance business in this state, and also exercises powers and privileges available to this state by virtue of P.L. 79–15 (1945), (Chapter 20, 1st Sess., S. 340), 59 Stats. 33, as amended, which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states. .

Acts 1967, 60th Leg., R.S., ch. 185, § 1, 1967 Tex.Gen.Laws 401, 401 (current version at Tex. Ins.Code art. 1.14–1, § 1).

and the Civil Practice and Remedies Code. It is certainly not a formal, unified Code such as the Uniform Commercial Code, which, from its inception, contained uniform definitions. While we agree with MUD that the Insurance Code is not merely a "hodge-podge," we cannot conclude that the Legislature intended article 1.14–1, enacted some ten years after article 21.21, to govern the scope of the term "business of insurance" as used in article 21.21.[6]

Similarly, the express inclusion or exclusion of suretyship as the "business of insurance" in other sections of the Code is not determinative of the scope of article 21.21. The fact that section 5 of article 21.55 of the Code, which was enacted in 1991, expressly excludes surety bonds from its scope does not provide insight to the Legislature's intention when it amended article 21.21 to regulate unfair or deceptive practices in 1957. *See* Acts 1991, 72nd Leg., R.S., ch. 242, § 11.03(a), 1991 Tex.Gen.Laws 939, 1043 (current version at Tex.Ins.Code art. 21.55).

Historically, the origins of suretyship predate the advent of insurance by thousands of years. Woods, *Historical Development of Suretyship*, Law of Suretyship 1–5, 10 (Gallagher ed. 1993). As discussed in Section II, *supra*, the characteristics of suretyship are different from those of insurance. Insurance involves the pooling and spreading of risk of the insureds, with no right of indemnity possessed by the insurer. Suretyship, on the other hand, allows a surety full rights of indemnity against its principal. *Commercial Standard Ins. Co. v. Ebner*, 149 Tex. 28, 228 S.W.2d 507, 509 (1950); *see also* Tex.Bus. & Com.Code § 34.04. Imposition of liability on a surety under article 21.21 would raise an odd dilemma: would a surety, traditionally entitled to indemnity from its principal, be entitled to indemnity for an article 21.21 violation? If so, a principal who owed no extracontractual duties to an owner would be in the position of paying tort-based extracontractual damages. If not, the ability of sureties to rely upon the defenses of their principal, a fundamental right of suretyship, would be undermined.

Given the unique character, rights, and obligations of suretyship, and the complexities that would result by the imposition of liability under 21.21, we cannot conclude that the Legislature intended to include suretyship in the definition of the business of insurance under article 21.21. Absent a clear legislative directive, we conclude that suretyship, as historically understood in the insurance and suretyship fields, does not constitute the business of insurance under article 21.21. We therefore hold that Great American is not liable to MUD under article 21.21.

## IV

■ Great American next contends that the court of appeals erred in failing to hold that its principal, Underground, was contractually relieved from liability in this case because the defects in the dry well were the result of the negligence of Smith Pump or Dippel Ulmann in designing the dry well. The standard specifications in the contract documents state

> The thickness of the sides shall be determined by the structural requirements for the depth of burial involved but shall be a minimum of ¼ inch thick.

Although the sides of the dry well were ¼ inch thick, the jury found that Underground failed to install a lift station with sides determined by the structural requirements for the depth of burial of the well. In arguing that it is contractually released from liability for this defect, Great American relies upon article 6.1 of the general conditions of the contract between MUD and Underground, which provides:

> CONTRACTOR [Underground] shall supervise and direct the Work competently and efficiently, devoting such attention thereto and applying such skills and expertise as may be necessary to perform the Work in accordance with the Contract Documents. CONTRACTOR shall be solely responsible for the means, methods, techniques, sequences and procedures of construction, but CONTRACTOR shall not be responsible for the negligence of others

---

6. Article 21.21 has been amended several times since the enactment of article 1.14–1. None of these amendments have referred to or incorporated any portion of article 1.14–1.

in the design or selection of a specific means, method, technique, sequence or procedure of construction which is indicated in and required by the Contract Documents. CONTRACTOR shall be responsible to see that the finished Work complies accurately with the Contract Documents.

Great American argues that the method of construction required by the contract documents was the refurbishment of an existing dry well, and that Smith Pump negligently completed the design of the method of refurbishment by failing to thicken the sides of the dry well. It contends that the design error was compounded by Dippel Ulmann when it approved Smith Pump's drawings, which did not indicate that the sides of the well would be thickened as part of the refurbishment process. Essentially, Great American is arguing that it is contractually relieved of responsibility for design defects.

This interpretation of the contract, however, broadens the scope of article 6.1 and ignores other provisions of the contract subjecting Underground to liability for the work done by its subcontractors. The contract states only that "[c]ontractor shall not be responsible for the negligence of others in the design or selection of a specific means, method, technique, sequence or procedure of construction *which is indicated in and required by the [c]ontract [d]ocuments.*" On its face, article 6.1 does not relieve Underground from responsibility for *all* design defects, but instead only for those *means, methods, techniques, or procedures of construction that are required in the contract documents.* The contract documents require that the sides of the dry well be of sufficient thickness for the depth of burial. The documents do not specify a means, method, technique, sequence, or procedure of construction to accomplish this goal. Underground is not relieved of responsibility for the work done

by Smith Pump or Dippel Ulmann under this section.

Moreover, other provisions of the contract affirm Underground's ultimate responsibility to see that the finished work conforms with the contract documents. Article 6.9 of the general conditions of the contract holds Underground responsible for the work done by its subcontractors such as Smith Pump:

CONTRACTOR shall be fully responsible to OWNER and ENGINEER for all acts and omissions of the Subcontractors, Suppliers and other persons or organizations performing or furnishing any of the Work under a direct or indirect contract with CONTRACTOR, just as CONTRACTOR is responsible for CONTRACTOR's own acts and omissions.

Likewise, Underground is not relieved of responsibility for the finished product by Dippel Ulmann's approval of Smith Pump's shop drawings. Article 6.27 provides that approval by the engineer of the drawings does not relieve the contractor for any errors or omissions in the drawings.[7] Simply stated, the contract required the sides of the dry well to be sufficient for its depth of burial; the fact that neither Smith Pump nor Dippel Ulmann designed or built a refurbished well with thickened sides does not absolve Underground from its contractual obligation to furnish a dry well in compliance with the contract specifications. We therefore affirm the court of appeals' judgment that Underground was not contractually relieved of liability to MUD.

V

In connection with MUD's claim for damages against Underground, Great American next contends that the trial court erred in refusing to submit an instruction regarding MUD's duty to mitigate damages. In answering the question relating to damages

7. Article 6.27 states
ENGINEER's review and approval of Shop Drawings or samples shall not relieve CONTRACTOR from responsibility for any variation from the requirements of the Contract Documents unless CONTRACTOR has in writing called ENGINEER's attention to each such variation at the time of submission as required by paragraph 6.25.2 and ENGINEER has giv-

en written approval of each such variation by a specific written notation thereof incorporated in or accompanying the Shop Drawing or sample approval; nor will any approval by ENGINEER relieve CONTRACTOR from responsibility for errors or omissions in the Shop Drawings or from responsibility for having complied with the provisions of paragraph 6.25.1.

caused by Underground, the court instructed the jury to find damages based upon "the reasonable and necessary cost to replace or repair" the lift station and refused Great American's tendered instruction regarding MUD's duty to mitigate its damages. Great American contends that the record contains some evidence that MUD could "mitigate" its damages in a reasonable fashion by repairing the lift station rather than completely replacing it, and that the trial court's refusal to so instruct the jury was harmful error.

 However, the doctrine of mitigation of damages is inapplicable to this case. This doctrine prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff:

> Where a party is entitled to the benefits of a contract and can save himself from the damages resulting from its breach at a trifling expense or with reasonable exertions, it is his duty to incur such expense and make such exertions.

*Walker v. Salt Flat Water Co.*, 128 Tex. 140, 96 S.W.2d 231, 232 (1936). No party in this case presented any evidence that MUD could have mitigated its damages, and it was not error for the trial court to refuse the requested instruction.

Great American in actuality is complaining that the jury did not agree with its assessment of damages in this case. The issue of damages was contested at trial, with MUD presenting evidence that the lift station needed to be replaced at a cost of $411,400, and representatives of Smith Pump testifying that the lift station could be repaired at a much lower cost. The jury's answer to the damages question in the amount of $411,400 is supported by some evidence in the record.

### VI

We initially granted writ in this case to consider Great American's points of error regarding the trial court's method of calculation of prejudgment interest and attorneys' fees in its judgment under the statutory tre-

bling provisions of article 21.21 of the Insurance Code. Because we hold that article 21.21 is inapplicable to commercial sureties, statutory trebling of damages is no longer at issue. However, we still must determine the extent of Great American's liability resulting from the contractual liability of their principal, including attorneys' fees, if this matter can be decided as a matter of law.

### A

The jury's findings support several different theories of liability against Underground.[8] No party disputes that Great American is liable under its performance bond as a matter of law if its principal, Underground, did in fact breach its contract with MUD. The jury found that the actual damages caused by Underground's breach were $411,400. The face value of the performance bond is $397,503.20. We first must determine the extent of Great American's liability in excess of the face value of the bond, if any.

 It is well settled that a performance bond is enforceable only to the extent of the obligee's actual damages. *Alpha Oil & Gas*, 747 S.W.2d at 378. Likewise, when an obligee's actual damages exceed the penal amount of a bond, a surety's liability generally is limited to the penal sum of the bond. *New Amsterdam Cas. Co. v. Bettes*, 407 S.W.2d 307, 314–15 (Tex.Civ.App.—Dallas 1966, writ ref'd n.r.e.) (surety not liable for actual or special damages caused by default of principal in excess of face amount of bond); *Bill Curphy Co. v. Elliott*, 207 F.2d 103, 108–09 (5th Cir.1953) (surety not liable for actual damages necessary to complete construction contract in excess of face amount of bond because to hold otherwise would make it "futile to state any amount of liability in the bond" and overlook "the well-established rule in Texas and elsewhere that the sole object of stating the penalty in a bond is to fix the limit of liability of the signers"). The specific terms of the perfor-

---

**8.** Specifically, the jury found that Underground failed to furnish and install a lift station with the thickness of the sides determined by the depth of burial, that Underground failed to correct defec-

tive work, and that Underground's failure to comply with its warranty was a producing cause of damages to MUD.

mance bond in this case limit MUD's total recovery, including "costs and other damages," to the total amount of $397,503.20.[9] We conclude, therefore, that Great American is not liable for MUD's actual damages caused by Underground's breach in excess of $397,503.20, the face value of the bond.

### B

■ We must determine if Great American is liable for attorneys' fees incurred either as a result of Underground's breach of contract or Great American's breach of its performance bond. We turn first to the issue of Underground's breach.

In accordance with the rule that a surety's liability on an underlying contract is limited to the penal sum of the bond, Great American is not liable for attorneys' fees assessed against its principal in excess of the bond amount. *T & R Painting Constr., Inc. v. St. Paul Fire & Marine Ins. Co.*, 23 Cal.App.4th 738, 29 Cal.Rptr.2d 199, 203 (1994) (holding that obligee can recover from surety attorneys' fees that are provided for in obligee's subcontract so long as the total recovery against the surety does not exceed the penal amount of the bond); *Harris v. Northwestern Nat'l Ins. Co.*, 6 Cal.App.4th 1061, 8 Cal.Rptr.2d 234, 238 (1992) (acknowledging the rule that surety cannot be required to pay attorneys' fees in excess of the penal sum of the bond); *Lawrence Tractor Co. v. Carlisle Ins. Co.*, 202 Cal.App.3d 949, 249 Cal.Rptr. 150, 153 (1988) (noting that unless contract specifically obligates surety to pay attorneys' fees in excess of penal sum of the bond, recovery for attorneys' fees from surety is limited to the amount of the bond); *Seattle–First Nat'l Bank v. Aetna Life &*

*Cas. Co.*, 31 Wash.App. 480, 642 P.2d 1259, 1260–61 (1982) (stating the general rule that a surety's liability for attorneys' fees cannot exceed the penal sum of the bond, but acknowledging that the rule may be varied by contract or statute).

■ While the limited terms of the surety bond itself do not provide a basis for MUD to recover attorneys' fees incurred as a result of Underground's breach in excess of the face amount, the obligation of Great American under the surety bond may provide a separate basis upon which MUD may recover attorneys' fees incurred as a result of Great American's default. Chapter 38.001 of the Texas Civil Practice and Remedies Code allows a party to recover reasonable attorneys' fees for a valid claim on an oral or written contract, and is to be liberally construed. TEX.CIV.PRAC. & REM.CODE §§ 38.001, 38.005. At issue is whether MUD's claim against Great American under the surety bond is a claim on a written contract.[10]

This Court has applied the common law of contracts to questions relating to a surety's liability. *Alpha Oil & Gas*, 747 S.W.2d at 379. Suretyship is a contract with three parties: the principal, the surety, and the obligee. The surety makes a direct promise to the obligee. *See Tolbert v. Standard Accident Ins. Co.*, 148 Tex. 235, 223 S.W.2d 617, 620 (1949). In this case, MUD was specifically named in the bond. The intended beneficiary of a contract can bring suit to enforce the contract. *See, e.g., Paragon Sales Co. v. New Hampshire Ins. Co.*, 774 S.W.2d 659, 660 (Tex.1989); *Dairyland County Mut. Ins. v. Childress*, 650 S.W.2d 770, 775 (Tex.1983); *Quilter v. Wendland*, 403 S.W.2d 335, 337

---

9. The performance bond specifically states:
 Underground Utilities Co. as Principal, hereinafter called Contractor and Great American Insurance Company, ... as Surety, are held and firmly bound unto North Austin Municipal Utility District No. One as Obligee, hereinafter called Owner, in the amount of $397,503.20. The bond further states that whenever the Contractor is in default the Surety may complete the contract in accordance with its terms and conditions or arrange for another contractor to complete the work and pay
 sufficient funds to pay the cost of completion less the balance of the contract price; *but not exceeding, including other costs and damages*

for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof.
 (emphasis added).

10. We note that under section 38.002, three prerequisites to recovery under section 38.001 exist: representation by an attorney, presentment of the claim, and lack of timely tender. TEX.CIV.PRAC. & REM.CODE § 38.002. MUD's third amended petition asserted that MUD was entitled to attorneys' fees under section 38.001 and that all conditions precedent had occurred. These conditions were in fact met.

(Tex.1966). MUD has a right to sue on the surety bond issued by Great American and is entitled under section 38.001 of the Texas Civil Practice and Remedies Code to recover attorneys' fees as a result of Great American's own default on the terms of its bond.[11]

### C

Having determined that Great American is liable for attorneys' fees incurred as a result of its breach of the performance bond as a matter of law, we next address the issue of the proper calculation of the amount of those fees. Question 17 submitted to the jury asked: "What is a reasonable fee for the necessary services of North Austin Municipal District's attorneys in this case, stated as a percentage of North Austin Municipal District's recovery?" The jury found 33⅓%. Great American argues that question 17 is defective because it does not require the jury to find attorneys' fees that are segregated by parties and claims.[12] However, MUD's recovery from each defendant can be determined from the jury's answer to the other damages issues, and attorneys' fees can be calculated as to each defendant on the claims for which it is actually found liable. Great American is liable for the breach of its performance bond occasioned by its refusal to pay or perform under the terms of that bond when Underground defaulted on its contractual obligations to MUD. The actual damages exceed the face amount of the bond and Great American is liable for the full amount of the bond, $397,503.20. The jury's response to question 17, finding a reasonable fee to be 33⅓% of the

recovery, can be applied to that amount. We therefore overrule this point of error.

The question of the proper calculation of the fees to be awarded under question 17 remains. Under the facts of this case, we hold that Great American is liable to MUD for attorneys' fees of $132,501.07, which is 33⅓% of $397,503.20. In so holding, we reject the method of calculation used by the trial court and affirmed by the court of appeals to award attorneys' fees against Great American under article 21.21. The court of appeals reasoned that because the jury awarded MUD attorneys' fees of 33⅓% of its "recovery," the fee award literally must constitute 33⅓% of the judgment in MUD's favor. Under this approach, if a trial court found that the amount of damages to be awarded to the plaintiff after calculating prejudgment interest and statutory trebling was $66.66, and the jury found a reasonable attorneys' fee to be 33⅓%, the award of attorneys' fees would be $33.33 (33⅓% of $100.00), not $22.22 (33⅓% of $66.66).[13] The court of appeals' method essentially inflates the award of attorneys' fees, resulting in an award not contemplated by the jury.

\* \* \* \* \* \*

We conclude that as a surety, Great American has no common law duty of good faith and fair dealing and that article 21.21 of the Insurance Code is inapplicable to a surety. We further hold that under the facts of this case, Great American is liable for breach of its bond in the amount of $397,503.20. We affirm in part and reverse in part the judgment of the court of appeals, and remand this case to the trial court for further proceedings

---

11. We note that the Legislature has expressly provided that a payment bond beneficiary who has provided public work labor or material under a public work contract may recover reasonable attorneys' fees in a suit against the principal or surety. Tex.Gov't Code §§ 2253.073, 2253.074. These sections are inapplicable here, as MUD's recovery against Great American is based upon the performance bond, rather than the payment bond.

12. Great American did not object to the form of this question on any basis other than its failure to segregate damages arising from the various parties and claims. We address the segregation issue but otherwise do not express an opinion as to the propriety of this question under section

38.001 of the Texas Civil Practice and Remedies Code.

13. Expressed algebraically, the formula used by the trial court to calculate attorneys' fees under article 21.21 is: $J = 3D + \frac{1}{3}J$, where J equals the total amount of the plaintiff's judgment, D equals the damages found by the jury plus prejudgment interest, and $\frac{1}{3}J$ equals the final amount of attorneys' fees to be awarded. Under this method of calculation, the trebled amount of damages (including prejudgment interest) will equal ⅔ of the plaintiff's judgment: $\frac{2}{3}J = 3D$. The plaintiff's total judgment therefore equals 4.5 times the actual damages figure (including prejudgment interest): $J = 9/2D$.

in conformity with this opinion, including a determination regarding prejudgment interest.