In The


 

Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-02-018 CV


____________________



U.S. RESTAURANT PROPERTIES OPERATING L.P., 


AND U.S. RESTAURANT PROPERTIES, INC., Appellants



V.



MOTEL ENTERPRISES, INC., Appellee






On Appeal from the 217th District Court


Angelina County, Texas


Trial Cause No. 30,717-97-12






OPINION



 Motel Enterprises, Inc. ("Motel") sued U.S. Restaurant Properties Operating L.P.
("USRP") and U.S. Restaurant Properties, Inc. for breach of contract. A jury awarded
Motel $550,000. This appeal challenges the sufficiency of the evidence, the measure of
damages, the jury charge, evidentiary rulings, and the calculation of prejudgment interest. (1)

Background


 Motel owned numerous Dairy Queens ("DQs"). Thirty-seven of the DQs were sold
to USRP, which then leased them to Bar S Restaurants, Inc. ("Bar S") in a lease-purchase
arrangement. USRP paid Motel almost $12,000,000 in cash for the Dairy Queens, but that
amount was $500,000 short of the actual price. Motel agreed to finance the remaining
$500,000 by taking a promissory note on which Bar S, the lessee of the Dairy Queens, was
the maker. USRP, Motel, and Bar S entered into a purchase and sale agreement containing
the following "put option": 

 At any time after the eighteenth (18th) month following the execution of this
Agreement, Motel shall have the right to cause USRP, upon delivery of ten
(10) days' prior written notice, to purchase that promissory note (the
"Note") of even date herewith, executed by Maker [Bar S] and payable to
the order of Motel in the principal sum of $500,000.00 . . . .


 Motel may not exercise the put option provided by this paragraph at any time
there is a continuing material uncured default by Maker [Bar S] under the
Lease Agreement (the "Lease Agreement") described in the Note . . . . 


The restaurant lease ("lease") between Bar S and USRP obligated Bar S to keep and
maintain each of the Dairy Queens in good order, condition, and repair, as follows:

 Tenant [Bar S] shall at its sole cost and expense keep and maintain each of
the Premises and Buildings, including sidewalks, landscaping and driveways
located on the Premises, in good order and condition and repair, and shall
. . . make all needed repairs and replacements, interior and exterior,
structural and nonstructural, ordinary and extraordinary, including but not
limited to, roof, air conditioning and heating systems, replacements of
cracked or broken grass [sic], repair of parking areas and driveway . . . . 
 

In April 1997, USRP sent Bar S the first of a series of letters claiming a lease default -- 
specifically the failure to maintain and appropriately repair the properties. USRP's last
letter of default to Bar S was in late September 1997. In early November 1997, Motel
notified USRP of Motel's exercise of the put option requiring USRP to purchase the note. 
Claiming Bar S was in default under the lease, USRP refused to purchase the note. 
Motel's lawsuit followed.

Liability


 USRP argues the evidence is legally and factually insufficient to support the jury's
answer to the following question: 

 Do you find from a preponderance of the evidence that at the time
Motel Enterprises, Inc. sought to exercise the put option, Bar S Restaurant,
Inc. was not in an uncured, material default on the Restaurant Lease [of]
Thirty-Seven Dairy Queen Restaurants with U.S. Restaurant Properties
Operating L.P.?

 ____ Bar S Restaurant Inc was not in an uncured, material
default; or

 ____ Bar S Restaurant Inc was in an uncured, material default. 
 

The jury found Bar S was not in an uncured, material default on the lease. Using language
from the lease, the jury instruction contained the following definition: 

 You are instructed . . . "an uncured, material default on the Restaurant
Lease Thirty-Seven Dairy Queen Restaurants" ("the Lease") is defined as
follows: 

 . . . .

 (d) A failure by [Bar S] to observe and perform any other provision of this
Lease to be observed or performed by [Bar S], where such failure continues
for twenty (20) business days after written notice thereof by the Landlord to 
[Bar S]. However, if the nature of the default is such that the default cannot
be reasonably cured within the twenty (20) business day period, [Bar S] shall
not be deemed to be in default if [Bar S] shall within such period of time
commence such cure and thereafter diligently prosecute the same to
completion[.]


 When an appellant attacks the legal sufficiency of an adverse finding on which it
does not have the burden of proof, it must demonstrate on appeal there is no evidence to
support the adverse finding. (2) See Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). 
On appeal, the evidence is viewed in "a light tending to support the jury's verdict," and
"all evidence and inferences contrary to the jury's finding" must be disregarded. Lenz v.
Lenz, 79 S.W.3d 10, 19 (Tex. 2002). In a factual sufficiency review, an appellate court
examines all the evidence, and will set aside a verdict only if the evidence is so weak or
the finding is so against the great weight and preponderance of the evidence that the verdict
is clearly wrong and unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 

 When USRP leased the properties to Bar S, some DQs were in disrepair, while
others were in "okay" condition. At the beginning of the lease, "[i]t was understood on
both sides that the properties were underperforming due to their current condition." The
parking lots were a concern, but it was understood that putting the parking lots in "A-1
condition" "wouldn't be immediate." As one witness explained, maintenance on the DQs
was a "continuous process"; there were always problems on the facilities that needed
addressing. 

 The record reveals Bar S was performing maintenance on seven stores at issue here. 
USRP's letters specified that the condition of the seven DQs placed Bar S in default. 
USRP said the parking lot in Diboll had potholes and needed to be resurfaced and
restriped, and the roof required repair. Bar S's improvements and maintenance in Diboll
included filling of potholes, a new menu board, new outside lighting, and retrofitting of
inside lighting. The Diboll parking lot was scheduled for resurfacing in the summer. 
USRP's letter alleging defaults at the Humble DQ included no specifics. Bar S responded
by noting the following improvements: new parking lot with striping; new paint job inside
and out; roof repair; new flooring; and gravel patio with outside tables. Improvements and
repairs at the Kountze DQ included a paint job inside and out, restriping of the parking lot,
installation of an air conditioning unit, and repair of the overhang. At Waskom, Bar S
patched the parking lot and put the building on a schedule for repainting. The resurfacing
and striping of the parking lot had not been done. At the Rusk DQ, the parking lot had
not been resurfaced, but Bar S was waiting on finalization of a joint site plan with Taco
Bell. The weeds and dead plants, complained of in the Rusk letter, would be replaced or
already had been. Other problems at Rusk included a soap dispenser on the floor, and the
lack of a switchplate in the men's restroom. Carroll Sullivan, Bar S chief executive
officer, believed all the repairs, except those to the parking lot, had been completed on the
Lufkin DQ, and Bar S was negotiating with Taco Bell to do a new parking lot. At the
Livingston DQ, Bar S had not resurfaced the parking lot, but the roof had been fixed and
the DQ painted. 

 In addition to requiring Bar S to keep the properties in good order, condition, and
repair, the lease provided for a two year plan for capital improvements and repairs in
excess of necessary maintenance. John Pettijohn, who handled the negotiations in USRP
transactions, indicated that Sullivan's plan was to spend at least $500,000 in the first eight
quarters for capital repairs and improvements, part of which would be for parking lots. 
Pettijohn explained that capital expenditures are different from repairs which need to be
done on a timely basis. Pettijohn's understanding was that the "stores in general . . . were
in substantial disrepair and a lot of repairs were getting worse." But he testified the
resurfacing of a parking lot was a capital improvement. Nancy Sedlak, the assets manager
for USRP, testified resurfacing was both a capital improvement and a necessary repair and
would fall within the $500,000 two year expenditures. Sullivan, Pettijohn, and Sedlak all
indicated the lease contemplated these types of repairs being made over eight calendar
quarters, or two years. At the time Motel exercised the put option, the two years had not
expired. 

 Because it had overfunded the acquisition and did not want to put any more money
into the Dairy Queen system, USRP decided not to buy the note. Pettijohn told Sullivan
that USRP was building a case, through the letters of default, that would give it grounds
to refuse to buy the note. Sedlak testified that during an April 1997 conversation Stetson,
the president of USRP, told her to look for any provision of the lease that Bar S was not
upholding. According to Sedlak, this conversation took place prior to all the DQ
inspections, except for the Lufkin DQ. (3) 

 As part of its ongoing maintenance program, Bar S had worked on all seven
locations, except the closed Lufkin DQ. Although Bar S had not addressed every repair
or maintenance issue raised by USRP, the jury reasonably could conclude from the
evidence that Bar S kept and maintained the premises and buildings in "good order and
condition and repair," that it was making "all needed repairs and replacements," and that
it was in compliance with the two year capital improvements program. Further, the jury
reasonably could conclude that USRP had determined not to buy the note prior to Motel's
exercise of the put option, and simply had set upon a course of action to insure that fact. 
Though USRP gave notice regarding seven DQs, it never revisited those stores or inquired
within the twenty day time frame to see if efforts were being made to cure the claimed
problems. We find there is legally sufficient evidence to support the jury finding, and the
evidence is not so weak that the finding is clearly wrong and unjust. The challenges to the
liability finding are overruled. 

Damages


 USRP argues the evidence is legally and factually insufficient to support the jury's
answer to the following damages question: 

 What sum of money, if any, if paid now in cash, would fairly and reasonably
compensate Motel Enterprises for its damages, if any, that resulted from U.S.
Restaurants' breach of the Put Option? 

 

 Consider the following elements, if any, and none other:


 The difference, if any, between the value of the Put Option agreed to by the parties
and the value of the Put Option as performed by U.S. Restaurants. The difference
in value, if any, shall be determined at the time the Put Option was breached. 

The jury answer was $550,000. 

 The put option provided that Motel had the right to cause USRP to purchase the
note for 110% of the then outstanding principal balance of the note. It is undisputed that
USRP refused to purchase the note. The note provided for payment of monthly interest
beginning June 1, 1996, but provided for no payment on principal until May 1, 2001. It
is undisputed that at the time Motel exercised its put option on November 3, 1997, the
principal balance was $500,000. The jury finding of $550,000 -- which is 110% of the
outstanding principal balance of the note -- accurately reflects these undisputed facts. The
sufficiency challenges to the damages finding are overruled. 

The Note


 Motel was awarded $550,000 for USRP's failure to purchase the note, but the
judgment does not address the transfer of the note. Motel suggests the judgment be
modified to provide for transfer of the note. We modify the judgment to order Motel to
legally transfer the note to USRP. See Tex. R. App. P. 43.2(b). 

The Jury Charge


 USRP argues that the measure of damages submitted to the jury in question 1-A,
quoted above, was incorrect. USRP requested the following jury question:

 What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate [Motel] for its damages, if any, that resulted from the
refusal of [USRP] to purchase the note dated April 30, 1996 from [Bar S]
payable to [Motel]?

 Consider the following elements of damages, if any, and none other.

 The difference, if any, between $550,000.00 and the value of the note
dated April 30, 1996 from [Bar S] payable to [Motel], as of November 14,
1997. 


 Do not add any amount for interest on the difference, if any. 


 Motel's measure of damages sought the difference between the value of the put
option as agreed to by the parties and the value of the put option as performed. USRP says
the measure is wrong, because it does not include any consideration of the losses Motel
avoided by not having to perform its contract with USRP. Although Motel contends
otherwise, we conclude USRP preserved the issue by tendering and obtaining a ruling on
its question and instruction on the measure of damages. See State Dep't of Highways &
Pub. Transp. v. Payne, 838 S.W.2d 235, 240-41 (Tex. 1992) (The test for preservation
of error concerning the jury charge is whether the party made the trial court aware of the
complaint, timely and plainly, and obtained a ruling.). 

 The general rule for measuring damages for breach of contract is "just
compensation for the loss or damage actually sustained." Phillips v. Phillips, 820 S.W.2d
785, 788 (Tex. 1991) (quoting Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486
(1952)). Typically, the "benefit of the bargain" measure, based on an expectancy theory,
is the difference between the value represented and the value received. See Henry S.
Miller Co. v. Bynum, 836 S.W.2d 160, 163 (Tex. 1992)(Phillips, J., concurring). Here,
Motel contracted for USRP's purchase of the note in a lump sum of $550,000, so long as
eighteen months of the lease had elapsed and Bar S was not in an uncured material default. 
USRP refused to purchase the note and paid Bar S nothing. The judgment as modified
transfers the note to USRP. The question, in effect, asked for the difference between the
value as represented or agreed to by the parties and the value Motel received. The
damages question submitted in the charge correctly reflects the general rule for measuring
breach of contract damages -- just compensation for the loss or damage sustained. The
challenge to jury question 1-A is overruled.

Expert Witness


 USRP contends the trial court erred in excluding the testimony of Jeffrey Balaban,
an expert witness on damages. To be admissible under Tex. R. Evid. 702, an expert's
testimony must be relevant to the issues in the case, and must be based on a reliable
foundation. See Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623, 628 (Tex. 2002). A trial
court has broad discretion in determining the admissibility of evidence. Id. at 629. The parties agreed that the purchase price of the note would be 110% of the then
outstanding principal balance of the note. It is undisputed that $500,000 was the
outstanding principal balance. Mathematically, 110% of $500,000 is $550,000. It is
undisputed that USRP paid nothing when it received notice Motel was exercising the put
option. The difference between the value of the put option as agreed to and the value of
the put option as performed is $550,000, which is the sum awarded. 

 To be relevant, expert testimony must be sufficiently tied to the facts of the case that
it will aid the jury in answering the questions presented. Id. An expert's opinion also may
be excluded as not reliable if the testimony presents too great a gap between undisputed
controlling facts and the opinion offered. And expert testimony which is of no assistance
to a jury in understanding the evidence or determining a fact issue should be excluded. See
K-Mart Corp. v. Honeycutt, 24 S.W.3d 357, 360-61 (Tex. 2000). Given the undisputed
facts establishing the amount of the damages calculated under the contract, the trial court
did not abuse its discretion in excluding the opinion testimony. 

Evidentiary Challenges


 USRP says the trial court erred during the damages phase of the trial by (a)
admitting evidence of Bar S's financial reversal and failure to pay the note after Motel
exercised the put option, and (b) admitting opinion testimony on the difference in value
between the put option as agreed to and as performed by USRP. Even if an evidentiary
ruling is erroneous, an appellate court ordinarily will not reverse and require a new trial
when the testimony is merely cumulative of other properly admitted evidence and is not
controlling on a material issue dispositive to the case. See Texas Dep't of Transp. v. Able,
35 S.W.3d 608, 617 (Tex. 2000). 

 The underlying material and controlling facts supporting the damage calculation
under the contract were undisputed, as detailed. The challenged evidence -- assuming it
need not and should not have been admitted given the undisputed controlling facts -- was
cumulative of other properly admitted evidence or did not control the damage finding; the
admission of the evidence does not require a new trial. The challenges to the trial court
evidentiary rulings are overruled. 

 Mitigation of Damages


 USRP contends the trial court should have included in the damages question the
following instruction on mitigation of damages: 

 Plaintiff [Motel] had an obligation to exercise reasonable care to lessen or
mitigate the damages it claims to have suffered. In determining the amount
of damages, if any, which [Motel] may have incurred as a result of USRP's
action, you are not to include any amount of damages which [Motel] could
have avoided by the exercise of reasonable care. 

The parties are entitled to have controlling and disputed fact issues submitted to the jury
if they are properly pleaded and supported by the evidence. See Triplex Communications,
Inc. v. Riley, 900 S.W.2d 716, 718 (Tex. 1995). A trial court may submit controlling
issues to the jury by questions, instructions, definitions, or a combination thereof. See
Wright Way Constr. Co. v. Harlingen Mall Co., 799 S.W.2d 415, 422 (Tex. App.--Corpus
Christi 1990, writ denied). When a trial judge refuses to submit a requested instruction,
the question on appeal is whether the request was reasonably necessary to enable the jury
to render a proper verdict. See Texas Workers' Comp. Ins. Fund v. Mandlbauer, 34
S.W.3d 909, 912 (Tex. 2000). The trial court has broad discretion in submitting jury
instructions. See Plainsman Trading Co. v. Crews, 898 S.W.2d 786, 791 (Tex. 1995). A plaintiff has a duty to mitigate when damages can be avoided by the plaintiff's
reasonable efforts made at a "trifling expense or with reasonable exertions." Great Am.
Ins. Co. v. North Austin Mun. Util. Dist. No. 1, 908 S.W.2d 415, 426 (Tex. 1995)
(quoting Walker v. Salt Flat Water Co., 128 Tex. 140, 96 S.W.2d 231, 232 (1936)). A
defendant has the burden of proving the plaintiff's lack of diligence and the amount by
which the failure to mitigate increased the damages. See Geotech Energy Corp. v. Gulf
States Telecomm. and Info. Sys., Inc., 788 S.W.2d 386, 390 (Tex. App.-- Houston [14th
Dist.] 1990, no writ). 

 In arguing for an instruction on mitigation, USRP relies on evidence that (a) Carroll
Sullivan had personally guaranteed the note; (b) the guarantee ran only to Motel, the payee
on the note; and (c) Motel admitted no efforts were made to enforce the guarantee
agreement. But the note with Bar S was not in default at the time USRP breached the put
option. The evidence was not relevant to mitigation at that time. 

 If USRP is claiming Motel had a duty to mitigate after the first trial (4) in this case,
we disagree. The trial court's prior judgment ordered Motel to deliver the note, properly
endorsed, to USRP. In January 2000, prior to this Court's decision in the first appeal of
this case, USRP, Bar S, and Sullivan entered into a "Mutual Release Agreement" in which
USRP acquired "substantially all of Bar S assets" and the parties mutually released any
claims against the others regarding the note and the purchase and sale agreement. In July
2000, this Court reversed the earlier judgment in Motel's favor, and the second trial
resulted. See U. S. Restaurant Properties Operating L.P. v. Motel Enters., Inc., 25
S.W.2d 293, 295 (Tex. App.--Beaumont 2000, pet. denied). We find no error in refusing
to include an instruction on mitigation of damages.

Liability of General Partner


 U.S. Restaurant Properties, Inc. asserts it is not liable because it was not a party to
the purchase and sale agreement; U.S. Restaurant Properties Operating, L.P. signed the
agreement. Motel sued both Properties, Inc. and Operating, L.P., and pleaded that
Properties, Inc. is the general partner of Operating, L.P. The defendants never denied that
Properties, Inc. was liable in the capacity in which it was sued, or asserted that there was
a defect of parties. See Tex. R. Civ. P. 93. In a general partnership, a partner is liable
for partnership debts jointly and severally with all other partners. See Burnap v. Linnartz,
914 S.W.2d 142, 151 (Tex. App.--San Antonio 1995, writ denied). Having failed to
plead otherwise, Properties, Inc., a general partner, is jointly and severally liable with
Operating L.P.


Prejudgment Interest


 In the alternative, USRP asks this Court to reduce the prejudgment interest by the
amount of interest Bar S paid to Motel under the terms of the note. Otherwise, says
USRP, Motel has a double recovery, since the prejudgment interest was running at the
same time Bar S was paying Motel interest on the note. Motel argues the issue is waived,
because USRP did not plead offset or credit; Motel asserts a better argument would be that
prejudgment interest did not commence until Bar S made its last payment. 

 We conclude USRP preserved its complaint below by raising the prejudgment
interest issue in its motion to modify or reform the judgment, and also that USRP is in
effect arguing that prejudgment interest should be calculated from the date Bar S made its
last interest payment. Prejudgment interest is compensation allowed by law as "additional
damages for lost use of money due as damages during the lapse of time between the
accrual of the claim and the date of judgment." Johnson & Higgins of Texas, Inc. v.
Kenneco Energy, Inc., 962 S.W.2d 507, 528 (Tex. 1998). USRP's issue on prejudgment
interest is sustained.

 With the exception of the prejudgment interest issue, appellants' issues are
overruled. Pursuant to Tex. R. App. P. 43.2(b), the judgment is modified to require Motel
to effect legal transfer of the note to USRP. The case is remanded to the trial court for a
recalculation of prejudgment interest consistent with this opinion.

 MODIFIED AND AFFIRMED IN PART, REVERSED AND REMANDED IN
PART.

 _________________________________

 DAVID B. GAULTNEY

 Justice


Submitted on February 6, 2003

Opinion Delivered April 17, 2003


Before McKeithen, C.J., Burgess and Gaultney, JJ.
1. This was the second trial of this case. See U.S. Restaurant Properties Operating
L.P. v. Motel Enters., Inc., 25 S.W.3d 293 (Tex. App.-- Beaumont 2000, pet denied).
2. Motel did not object to the placement of the burden of proof. No argument is made
on appeal that USRP had the burden to prove an uncured, material default. 
3. There were two Lufkin DQs, one of which had been closed. Pettijohn told Sullivan
it was not advisable to spend money on the closed store. 
4. The first trial occurred in 1998.