

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-11-00739-CV

Robert **VALDEZ**, individually and as administrator of the Estate of Pierre V. Bernard, deceased, and Fidelity and Casualty Company of New York,
Appellants

v.

David **HOLLENBECK**, individually and as the successor administrator of the Estate of Pierre V. Bernard, deceased, Will Francis Baron, John Bernard Baron, Bernard Rae Bernard Box, Daryl Bernard, Marcus Bernard, Barbara Streff Grachek, Pam Streff Myers, Steve Streff, Scott Streff, Yvonne Baron Fischer, Elizabeth Lamar, Kelly Lamar Loeffelholz, Jeanne Mary Lamar, John Lamar, David Lamar, Greg Lamar, Chris Lamar, Eric Lamar, Robert Rogers, Dana Rogers, John Rogers, individually, and Dana Rogers and Sherrie Ann Grogan, in their capacity as joint independent executrix of the Estate of Charles Rogers, deceased,
Appellees

From the Probate Court No. 1, Bexar County, Texas
Trial Court No. 2006-PC-3799
Honorable Polly Jackson Spencer, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Catherine Stone, Chief Justice
            Karen Angelini, Justice
            Marialyn Barnard, Justice

Delivered and Filed:  April 24, 2013

AFFIRMED

This appeal arises from a statutory and equitable bill of review proceeding to set aside orders signed by the probate court in 1996 that approved the account for final settlement and discharged Robert Valdez as administrator of the Estate of Pierre V. Bernard, deceased. In the underlying proceeding, after discovering that Melvyn Spillman, a former clerk with the Bexar

County Clerk's Office, had stolen funds from bank accounts owned by the decedent, which had not been accounted for by Valdez in the estate's final settlement, the heirs to the estate filed a bill of review seeking to set aside the 1996 Orders. After the probate court conducted a bench trial in the bill of review proceeding, the court granted an equitable bill of review and set aside the 1996 Orders. The probate court then appointed David Hollenbeck to serve as successor independent administrator of the estate, and in an amended petition, Hollenbeck substituted in for the heirs. After a bench trial on the merits, the probate court signed a final judgment in favor of the estate, determining that actual damages to the estate were in the amount of $465,956.79. Robert Valdez, individually and as administrator of the Estate of Pierre V. Bernard, and the surety, Fidelity and Casualty Company of New York ("Fidelity"), appeal from the probate court's final judgment. On appeal, both Fidelity and Valdez argue that the probate court erred in granting the equitable bill of review. Fidelity also argues that at the trial on the merits, there was no evidence of proximate causation and that the probate court erred in awarding judgment to Hollenbeck against Fidelity for an additional sum of $78,035.62 in pre-judgment interest because it was error for the probate court to award judgment against Fidelity for any amount in excess of the amount of its bond. In addition, Valdez argues that (1) the probate court should not have admitted in evidence the estate's 1993 IRS tax return, and (2) there is no evidence of a meritorious claim or defense. We affirm the judgment.

BACKGROUND

Pierre V. Bernard died on January 25, 1994. Shortly after Bernard's death, Melvyn Spillman, who at the time was an employee of the Bexar County Clerk's Office, called Robert A. Valdez, a local attorney, and told Valdez that an attorney needed to be appointed as administrator of Bernard's estate. On January 27, 1994, Valdez applied to be the administrator of Bernard's estate, and on February 23, 1994, the probate court appointed Valdez as administrator. Fidelity,

as surety, issued an administrator's bond on behalf of Valdez, as principal, in the amount of $260,000. Valdez then went to Bernard's home for the purpose of looking for records or other items that might reflect what assets Bernard owned at the time of his death. Based on records Valdez found, he prepared an inventory and appraisement of the estate and filed it with the probate court on March 3, 1994. The inventory and appraisement indicated that the gross value of the estate was $411,000, including $150,000 in real property and $261,000 in personal property.

The inventory identified the following bank accounts owned by Bernard at the time of his death:

(1) Bank of the West in the amount of $100,000;

(2) NationsBank in the amount of $85,000;

(3) Eisenhower National Bank in the amount of $25,000;

(4) Guaranty Savings in the amount of $25,000; and

(5) Jefferson Bank in the amount of $25,000.

On March 10, 1994, the probate court approved the inventory. On May 2, 1994, a 1993 Federal Income Tax Return was filed on behalf of Bernard's estate. The 1993 Tax Return identifies the following institutions at which Bernard maintained accounts that earned taxable interest during tax year 1993:

(1) Bank of the West;

(2) Broadway Bank;

(3) Eisenhower Bank;

(4) Guaranty Federal Savings;

(5) IBC;

(6) Jefferson State Bank;

(7) NationsBank;

(8) Security National; and

(9) Eisenhower National.

Thus, the 1993 Tax Return listed institutions not included on the inventory filed with the court: Broadway Bank; IBC; and Security National. It also listed a second account at Eisenhower National.

On April 3, 1996, Valdez filed his Application for Payment of Attorney's Fees. On this application, Valdez billed 2.15 hours on April 12, 1994, for "gather[ing] tax info for CPA" and 1.30 hours on April 20, 1994, for "telephone conversation with CPA, pay bills." On May 8, 1996, Valdez filed his account for final settlement, which did not include several of the bank accounts listed on the 1993 Tax Return. On June 14, 1996, the probate court signed an Order Approving Account for Final Settlement and Authorizing Distribution of the Estate. On October 4, 1996, the probate court signed an Order Closing Estate and Discharging Personal Representative, in which the court released and discharged Fidelity from any further liability on the bond.

Spillman, the former employee of the Bexar County Clerk's Office who had informed Valdez of the need for an administrator of Bernard's estate, was later charged with criminal acts stemming from fraud in various probate cases. On April 12, 2002, Edward L. Rishebarger, CPA, was appointed to serve as a receiver of the assets seized from Spillman and to assist the Bexar County District Attorney's Office in its investigation of Spillman. Rishebarger identified 127 estates against which Spillman had committed criminal acts. The Bernard Estate was one of these estates. Rishebarger was charged with the responsibility of ascertaining the value of the Bernard Estate at the time of Bernard's death and the amount stolen by Spillman. Rishebarger calculated the amount of personal property assets belonging to Bernard at the time of his death to

be $698,319.08. He determined that Bernard owned the following bank accounts at the time of his death: (1) NationsBank in the amount of $83,390.70; (2) NationsBank in the amount of $3,697.78; (3) IBC in the amount of $100,000; (4) Security National in the amount of $5,050.00; (5) Jefferson Bank in the amount of $100,092.93; (6) Eisenhower Bank in the amount of $100,052.75; (7) Broadway Bank in the amount of $100,860.64; (8) Guaranty Federal (three accounts) in the amount of $105,174.28; and (9) Bank of the West in the amount of $100,000. Rishebarger concluded that Spillman stole $522,834.79 from the Bernard Estate.

In March and April 2003, Bernard Baron and other heirs of the Bernard Estate received a letter from Rishebarger, which informed them of a problem with the Bernard Estate involving Spillman. The heirs of the Bernard Estate met and decided to elect Bernard Baron, a cousin to Pierre V. Bernard, to be their leader with respect to matters relating to the estate. On September 2, 2003, Rishebarger sent the heirs a copy of his Report of Receiver and Motion for Court Authority to Approve Plan of Distribution and Payment of Fees and Expenses. Rishebarger's report listed $522,834.79 as the amount Spillman stole from the Bernard Estate.

In early 2004, Bernard Baron retained Don Stecker, an attorney. On March 8, 2005, Bernard Baron filed an application to re-open administration of the Bernard Estate and for Appointment as Successor Administrator. On May 9, 2005, pursuant to a distribution plan approved by a court, Rishebarger mailed a check in the amount of $56,878.00 to Stecker as counsel for the heirs. On May 31, 2005, the heirs sued Valdez for breach of fiduciary duties and Fidelity as surety on the bond issued to Valdez. During the pendency of this lawsuit, the probate court determined that it lacked jurisdiction to appoint Baron as Successor Administrator and/or reopen the Estate without first setting aside the prior court orders in the 1994 probate case. Thus, on December 11, 2006, the heirs filed a petition for bill of review.

The petition sought both a statutory and equitable bill of review to set aside the 1996 Order Approving Account for Final Settlement and Order Discharging Valdez. The petition asked for a statutory bill of review pursuant to section 31 of the Texas Probate Code. Section 31 provides that

> [a]ny person interested may, by a bill of review filed in the court in which the probate proceedings were had, have any decision, order, or judgment rendered by the court, or the judge thereof, revised and corrected on showing of error therein; but no process of action under such decision, order or judgment shall be stayed except by writ of injunction, and no bill of review shall be filed after two years have elapsed from the date of such decision, order or judgment.

TEX. PROB. CODE ANN. § 31 (West 2003). In the alternative, the petition alleged an equitable bill of review.

On December 14, 2007, a bench trial was conducted in the bill of review proceeding. The probate court denied the heirs' request for a statutory bill of review, but granted the heirs' request for an equitable bill of review. On February 9, 2009, the probate court signed an interlocutory, non-appealable Judgment Granting Equitable Bill of Review. The judgment states that the 1996 Orders were "entered as the result of fraud, accident or wrongful acts of" Valdez, that the 1996 Orders were rendered "without any negligence on the part of the petitioners"; and that the petitioners had presented "sufficient evidence to constitute a meritorious claim or defense." The judgment further states that the 1996 Orders "were not rendered as the result of any fraud, accident, or wrongful acts on the part of" Fidelity and that "nothing that Fidelity did nor failed to do prevented petitioners from pursuing this bill of review prior to December 13, 2006." The judgment further states that petitioners "had no legal remedy available to avoid the effect" of the 1996 Orders. The judgment then set aside the 1996 Orders.

On April 15, 2009, David Hollenbeck was appointed to serve as successor independent administrator of the Estate. In the third amended original petition, Hollenbeck substituted in for

the heirs as plaintiff, and on August 18, 2010, a bench trial was conducted on the merits. A final judgment was signed by the probate court on July 14, 2011. The probate court found that the difference between the amount that Spillman stole ($522,834.79), and the amount that Rishebarger was able to distribute from the seized funds ($56,878.00) was $465,956.79. The probate court thus concluded that actual damages that the Bernard Estate incurred were in the amount of $465,956.79. The final judgment awarded Hollenbeck, in his capacity as Successor Independent Administrator of the Estate, actual damages in the amount of $465,956.00, apportioned against the Defendants as follows:

(1) Valdez, individually, and as former administrator of the Estate, and Fidelity are jointly and severally liable for $260,000.00; and

(2) Valdez, individually, and as former administrator of the Estate, is "further liable for the additional sum of" $205.956.00.

The final judgment also awarded Fidelity the sum of $260,000.00 against Valdez and Spillman, who were found to be jointly and severally liable. And, the final judgment awarded Valdez the sum of $465,956.00 against Spillman. The judgment noted that "notwithstanding the separate nature of the judgments awarded to Fidelity and Valdez against Spillman, it is the intent of the court that Spillman's liability to Fidelity and Valdez for actual damages be in the total amount of" $465,956.00. Valdez and Fidelity then filed separate notices of appeal.

## EQUITABLE BILL OF REVIEW

A bill of review is an equitable action brought by a party to a prior action who seeks to set aside a judgment that is no longer appealable or subject to a motion for new trial. *Temple v. Archambo*, 161 S.W.3d 217, 222–23 (Tex. App.—Corpus Christi 2005, no pet.). And, although a bill of review is an equitable proceeding, the fact that an injustice may have occurred is not sufficient to justify relief by bill of review. *Id.* at 224. A bill of review requires "something more than injustice." *Crouch v. McGaw*, 134 Tex. 633, 138 S.W.2d 94, 96 (1940). Thus, the grounds

upon which a bill of review can be obtained are narrow because the procedure conflicts with the fundamental policy that judgments must become final at some point. *King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). And, the burden on a bill of review petitioner is heavy. *Temple*, 161 S.W.3d at 223. Before a litigant can successfully invoke the equitable powers of a court and secure a bill of review to set aside a final judgment, he must allege and prove: (1) a meritorious claim or defense to the underlying judgment sought to be set aside, (2) which he was prevented from making by fraud, accident, or wrongful act by the opposing party, (3) unmixed with any fault of his own. *King Ranch*, 118 S.W.3d at 751–52; *Hernandez v. Koch Mach. Co.*, 16 S.W.3d 48, 57 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). The petitioner must further allege, with particularity, sworn facts sufficient to constitute a meritorious defense and, as a pretrial matter, present prima facie proof to support the contention. *Temple*, 161 S.W.3d at 223. The bill of review defendant may respond with like proof showing that the defense is barred as a matter of law, but factual questions arising out of factual disputes are resolved in favor of the complainant for the purposes of this pretrial, legal determination. *Id.* If the court determines that a prima facie meritorious defense has not been made out, the proceeding terminates and the trial court shall dismiss the case. *Id.* On the other hand, if a prima facie meritorious defense has been shown, the court will conduct a trial. *Id.* At trial, the petitioner must prove the elements of the bill of review by a preponderance of the evidence. *Martin v. Martin*, 840 S.W.2d 586, 592 (Tex. App.—Tyler 1992, writ denied). If the petitioner is successful, then the court will permit the parties to revert to their original status as plaintiff and defendant with the burden on the original plaintiff to prove the underlying cause of action. *Caldwell v. Barnes*, 154 S.W.3d 93, 97–98 (Tex. 2004) (*Caldwell II*). Once the trial is completed, the court will render a new final judgment. *See id.*

Additionally, the petitioner must show that he exercised due diligence in prosecuting all adequate legal remedies with respect to the underlying judgment or order. *King Ranch*, 118 S.W.3d at 751. Thus, a "bill of review is proper where a party has exercised due diligence to prosecute all adequate legal remedies against a former judgment, and at the time the bill of review is filed, there remains no such adequate legal remedy still available because, through no fault of the bill's proponent, fraud, accident or mistake precludes presentation of a meritorious claim or defense." *Id.* We review the granting or denial of a bill of review under an abuse of discretion standard. *Temple*, 161 S.W.3d at 224. When the inquiry on the bill of review concerns a question of law, we review the trial court's decision de novo. *Id.*

On appeal, Fidelity argues that the probate court erred in granting the bill of review against it for the following reasons:

1. The bill of review was barred by limitations because the petition was filed more than ten years after the 1996 Probate Orders were signed;

2. The probate court specifically found and stated in the Judgment Granting Equitable Bill of Review that the 1996 Probate Orders were not rendered as the result of any fraud, accident, or wrongful act on the part of Fidelity and that nothing Fidelity did or failed to do prevented the heirs from pursuing the bill of review prior to December 13, 1996. And, Fidelity argues that any act committed by Valdez cannot be imputed to it in the context of a bill of review proceeding because in such a proceeding, the heirs are required to prove the elements of a bill of review separately as to each defendant;

3. The heirs failed to timely pursue their legal remedies by filing a statutory bill of review, even after they learned that Spillman had stolen assets from the Bernard Estate in March and April 2003.

4. The heirs failed to show a meritorious cause of action.

Valdez also argues that the bill of review is barred by limitations and that the heirs failed to timely pursue their legal remedies.

A.  *Statute of Limitations*

1.  *Is Valdez's conduct attributable to Fidelity in a bill of review proceeding?*

An equitable bill of review must be filed within four years of the date that the subject order or judgment was signed or it is barred by limitations. *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998) (*Caldwell I*). Fidelity and Valdez argue the equitable bill of review granted by the probate court is barred by limitations because it was filed by the heirs more than ten years after the 1996 Orders (Order Closing Estate and Discharging Personal Representative) were signed. Both Valdez and Fidelity emphasize that the only exception to the four year limitation period is when the petitioner proves extrinsic fraud. *See Temple*, 161 S.W.3d at 223–24; *Stiggers v. Wash. Mut. Bank*, No. 04-06-00575-CV, 2007 WL 390391, at *2 (Tex. App.—San Antonio 2007, pet. denied); *Defee v. Defee*, 966 S.W.2d 719, 722 (Tex. App.—San Antonio 1998, no pet.). Both Valdez and Fidelity argue that there is no evidence that Valdez committed extrinsic fraud. Fidelity also argues that there is no evidence Fidelity committed extrinsic fraud. Fidelity emphasizes that the probate court specifically found that it did not engage in any wrongful conduct. Thus, with respect to Fidelity, the judgment can be affirmed only if (1) Valdez's conduct can be imputed to Fidelity and (2) Valdez's conduct constituted extrinsic fraud. Therefore, we must first determine whether any wrongful conduct by Valdez can be imputed to Fidelity in the context of a bill of review proceeding, or whether the heirs were required to prove wrongful conduct on Fidelity's part separate and apart from any wrongful conduct on the part of Valdez.

Hollenbeck argues that because the relationship of Valdez and Fidelity is that of principal and surety, the rules that require a plaintiff to prove fraud separately as to each defendant do not apply. Fidelity contends that such is not the case. Although Fidelity admits that there is no case law on this issue in the specific context of setting aside a final probate order in a bill of review

proceeding, it points to authority dealing with the principal/surety relationship in the context of equitably tolling the statute of limitations based on the fraudulent conduct of a principal. Fidelity first cites *Alexander v. Hagedorn*, 148 Tex. 565, 226 S.W.2d 996 (1950), which gives general propositions of law but does not address the situation at issue here: when does the discovery rule toll in the context of a principal and a surety. Fidelity also cites the following authority: *General Insurance Co. of America v. United States*, 406 F.2d 442 (5th Cir. 1969); *Safe Environment of America, Inc. v. Employers Insurance*, 278 F. Supp. 2d 121 (D. Mass. 2003); *Cato v. Southern Atlantic & Gulf Coast District*, 364 F. Supp. 489 (S.D. Tex.), *aff'd*, 485 F.2d 583 (5th Cir. 1973); *In re Dreier LLP*, 421 B.R. 60 (Bankr. S.D.N.Y. 2009); and *Park Associates v. Crescent Park Associates*, 552 N.Y.S.2d 314 (N.Y. App. Div. 1990). These cases, however, are distinguishable from the facts presented here.

Two of these cases, *General Insurance* and *Safe Environment*, relate to the Miller Act, a federal statute relating to work on a public building where the contract is for more than $100,000. *General Ins.*, 406 F.2d at 443; *Safe Environ.*, 278 F. Supp. 2d at 123. Under the Miller Act, a payment bond is required to protect all persons supplying labor and material on such a federal project. *Safe Environ.*, 278 F. Supp. 2d at 123. The Act provides that "[e]very person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 . . . may bring a civil action on the payment bond for the amount unpaid . . . ." 40 U.S.C. § 3133(b)(1). The Act's statute of limitations provides that an "action brought under this subsection must be brought no later than one year after the day on which the last of the labor performed or material was supplied by the person bringing the action." *Id.* § 3133(b)(4). However, because there is an extensive statutory scheme under the Miller Act, *General Insurance* and *Safe Environment* are not comparable to the facts presented here.

Similarly, *Cato*, 364 F. Supp. at 493, is distinguishable from the facts presented here. *Cato* involved whether fraud on the part of a union would prevent the application of the statute of limitations defense as to the non-union defendants who did not participate in the fraud. The Fifth Circuit noted that "[g]enerally the acts of third parties in concealing a cause of action will not prevent the running of the limitations period as to the real defendant." *Id.* Our facts, whether a principal's acts should be imputed to the surety for limitations purposes, are distinguishable from this general rule. And, the final two cases cited by Fidelity, *In re Dreier*, 421 B.R. at 63, and *Park Associates*, 552 N.Y.2d at 461, deal with promissory notes and are likewise distinguishable from the facts presented here.

In contrast, Hollenbeck cites *Mills v. Baird*, 147 S.W.2d 312 (Tex. Civ. App.—Austin 1941, writ ref'd), which does address the issue presented in this case. In *Mills*, the surety argued that because "it was not a party to or cognizant of the fraud, limitation was not tolled thereby as to it," and the bill of review proceeding "was barred as to it since four years had elapsed since order approving the final account (April 7, 1931) and prior to the amendment in the District Court making it a party to the proceeding (May 8, 1935)." *Id.* at 315. In considering the issue, the court reasoned that

> the right to bring the action did not accrue as to the principal until [the plaintiff] discovered or should have discovered the fraud. And since the surety was only secondarily liable and could not be sued without its principal, it would seem logically to follow that the cause of action as to it did not accrue until that against its principal accrued. The undertaking of the surety is to make good any breach of official duty of its principal, whether or not tainted with fraud – not because of anything the surety may have done or failed to do, but because the surety has so bound itself by its undertaking. Fraud of its principal, with all its consequences, is a risk it assumes to compensate by virtue of its obligation of suretyship.

*Id.* at 316. We agree with this reasoning of the *Mills* court. Thus, in considering whether the statute of limitations was tolled, we look to any extrinsic fraud committed by Valdez, not Fidelity.

*2. Who had the burden to prove that Valdez committed extrinsic fraud?*

As noted, a bill of review must be filed within the residual four-year statute of limitations. "The only exception to the four-year limitation is where the *petitioner* proves extrinsic fraud." *Temple*, 161 S.W.3d at 223–24 (emphasis added); *see also Law v. Law*, 792 S.W.2d 150, 153 (Tex. App.—Houston [1st Dist.] 1990, writ denied). Here, it is undisputed that the bill of review was filed more than four years after the judgment. Thus, because the bill of review was filed outside the four year statute of limitations, the only way Hollenbeck could extend the time was to allege extrinsic fraud. *See Law*, 792 S.W.2d at 153 ("Because Ms. Law filed the bill of review outside the four year statute of limitations, the only way she could extend the time was to allege extrinsic fraud."). Hollenbeck made such an allegation in the petition for bill of review, and at trial, he had the burden of proving extrinsic fraud.[1] *See Defee*, 966 S.W.2d at 722 (holding that because the petitioner at trial did not prove extrinsic fraud, the statute of limitations barred petitioner's bill of review).

*3. Is there evidence that Valdez committed extrinsic fraud?*

Both Valdez and Fidelity argue that there is no evidence that Valdez committed extrinsic fraud. "The bar of limitations does not commence to run until the petitioner discovered, or in the exercise of due care, ought to have discovered the [extrinsic] fraud." *Defee*, 966 S.W.2d at 722. Extrinsic fraud is fraud that "denies a party the opportunity to fully litigate at trial all the rights or defenses that could have been asserted." *Temple*, 161 S.W.3d at 224. "It is wrongful conduct practiced outside of the adversary trial–such as keeping a party away from court, making false promises of compromise, denying a party knowledge of the suit–that affects the manner in which

---

[1] We note that Hollenbeck argues Fidelity and Valdez had the burden to prove extrinsic fraud and cites cases standing for the proposition that limitations is an affirmative defense on which Fidelity and Valdez would have the burden of proof. However, not one of the cases cited by Hollenbeck is in the context of when the statute of limitations is tolled *in an equitable bill of review proceeding*.

the judgment is procured." *Id.* "Extrinsic fraud is collateral fraud in the sense that it must be 'collateral' to the matter actually tried and not something [that] was actually or potentially in issue in the trial." *Id.* "Intrinsic fraud, by contrast, relates to the merits of the issues [that] were presented and resolved–or could have been resolved–in the former action." *Id.* (citation omitted). "Within that term are included such matters as fraudulent instruments, perjured testimony, or any matter [that] was actually presented to and considered by the trial court in rendering the judgment assailed." *Id.* "Instrinsic fraud is 'inherent in the matter considered and determined before the trial court where the fraudulent acts pertain to an issue involved in the original action, or where the acts constituting the fraud were, or *could have been* litigated therein.'" *Id.* (quoting *Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984)) (emphasis in original). The Texas Supreme Court has held that "in the context of a fiduciary's duty of full disclosure, in a suit to partition or divide assets, the fraudulent concealment of an asset is extrinsic fraud that will justify a court in setting aside its former judgment in an equitable proceeding." *Montgomery*, 669 S.W.2d at 313. Thus, "the concealment of a material fact by a fiduciary charged with the duty of full disclosure is extrinsic fraud." *Id.* "The controlling question is always whether the alleged fraud prevented the party from knowing about and presenting his legal rights at trial." *Id.* at 314.

Here, the probate court found that the "failure to disclose material information by a fiduciary constitutes 'extrinsic fraud,'" and that Valdez's "failure to disclose all of the assets (bank accounts) in the documents filed of record in the administration of the Estate of Pierre V. Bernard, Deceased, but yet disclosing such information in the 1993 U.S. Individual Income Tax Return of Pierre V. Bernard, Deceased, which was not made available to the petitioners for review, constitutes 'extrinsic fraud.'"

Valdez argues that the probate court erred in relying on the information contained in the 1993 tax return as evidence showing that he committed extrinsic fraud because according to

Valdez, the probate court should not have admitted the copy of the 1993 tax return in evidence. Valdez argues the copy of the 1993 tax return was unauthenticated, constituted hearsay, and was not the best evidence. We review a trial court's decision to admit or exclude evidence for abuse of discretion. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). Texas Rule of Evidence 902, "Self-Authentication," provides that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to . . . (10) Business Records Accompanied by Affidavit." TEX. R. EVID. 902(10).

> Any record or set of records or photographically reproduced copies of such records, which would be admissible under Rule 803(6) or (7) shall be admissible in evidence in any court in this state upon the affidavit of the person who would otherwise provide the prerequisites of Rule 803(6) or (7), that such records attached to such affidavit were in fact so kept as required by Rule 803(6) or (7), provided further, that such record or records along with such affidavit are filed with the clerk of the court for inclusion with the papers in the cause in which the record or records are sought to be used as evidence at least fourteen days prior to the day upon which trial of said cause commences, . . . .

TEX. R. EVID. 902(10). Rule 803(6) (i.e., the business record exception) provides that a record of regularly conducted activity is not excluded by the hearsay rule even if the declarant is available to testify. *See* TEX. R. EVID. 803(6). Here, attached to the tax return was the affidavit of Charles Young, C.P.A., the certified public accountant who prepared the Estate's 1993 tax return. In the affidavit, Young affirmed that he is the custodian of records of Charlie Young, CPA, who is associated with Thompson, Williams, Biediger, Kastor & Young, L.C. Young affirmed that attached to the affidavit are twelve pages of records pertaining to Pierre V. Bernard from Charlie Young, CPA, who is associated with Thompson, Williams, Biediger, Kastor & Young, L.C. According to the affidavit, the twelve pages consist of "the 1993 1040 U.S. Individual Income Tax Return and the various attachments to said return and the W-2 for Pierre V. Bernard and the blue 'instruction sheet' all of which [were] contained within the red 'Client's Copy' folder from Thompson, Williams, Biediger, Kastor, & Young, L.C." Young affirmed that these twelve pages

of records were kept by him in the regular course of business and that it was the regular course of business of "Charlie Young, CPA and Thompson, Williams, Biediger, Kastor & Young, L.C., for an employee or representative of Charlie Young, CPA and Thompson, Williams, Biediger, Kastor & Young, L.C., with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit the information thereof to be included in such record." Young also affirmed that the records were "made at or near the time or reasonably soon thereafter" and that the records attached were "the original or exact duplicates of the original." Young's affidavit meets the requirements of Rule 803(6) and thus is not inadmissible hearsay. *See Curran v. Unis*, 711 S.W.2d 290, 293–96 (Tex. App.—Dallas 1986, no writ) (holding that (1) income tax returns are business records made in the regular course of business and admissible under Rule 803(6) and (2) the trial court erred in excluding tax return where custodian of records for a partnership testified that the income tax returns were made in the regular course of business). Further, the affidavit and tax return were timely filed in the probate court pursuant to Rule 902(10). Therefore, we hold the probate court did not abuse its discretion in overruling Valdez's objections to hearsay and authentication.

With regard to the best evidence rule, Young affirmed that the tax return and its accompanying papers were an exact duplicate of the original. The original return, of course, was submitted to the Internal Revenue Service. *See* TEX. R. EVID. 1004(b) & (c) (providing that the original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if no original can be obtained by any available judicial process or procedure; or no original is located in Texas). Further, Texas Rule of Evidence 1005 allows the admission of a duplicate if a witness who has compared the duplicate to the original testifies it is a correct copy. *See* TEX. R. EVID. 1005. *See Curran*, 711 S.W.2d at 294 (noting that the original tax return was submitted to the IRS and finding no merit to the best evidence objection to the admissibility of

the tax return because the testimony indicated that the copy of the tax return was true and correct). Young's affidavit affirmed that the copy of the tax return was an exact duplicate of the original return. Therefore, we find no abuse of discretion by the trial court in admitting the 1993 tax return.

Having determined that the trial court did not err in admitting the 1993 tax return in evidence, we must now turn back to the issue of whether the trial court abused its discretion in granting the bill of review because there was no evidence that Valdez committed extrinsic fraud. *See Temple*, 161 S.W.3d at 224. Although the 1993 tax return exhibit was not signed by Valdez himself, but was instead signed by Young as a "paid preparer," the trial court linked Valdez *to the information* on the 1993 tax return. Specifically, the probate court found the following:

1. On or about April 3, 1996, Valdez filed his Application for Payment of Attorney's Fees with his verified itemized list of services provided, dates of services provided and time incurred for each service.

2. Evidence further exists that Valdez participated in the preparation of the 1993 tax return in that the verified Application for Payment of Attorney's Fees indicates that on April 12, 1994, Valdez gathered information for the CPA.

3. Although Valdez denies personal recollection of the event, Valdez confirms that he must have gathered this information for the CPA to prepare the 1993 tax return on behalf of Pierre V. Bernard if such information is reflected in his verified billing records.

4. Further enhancing Valdez's knowledge of the content of the 1993 tax return filed on behalf of Pierre V. Bernard is Valdez's testimony that the information he gathered is very possibly the information contained in the tax return.

5. Of particular significance, Valdez testified that paying $19,903 in federal income taxes (as reflected in the Account for Final Settlement) did not raise any issues in his mind that the amount of taxes were a lot for this estate, since he had seen the tax return and the amount was consistent with the tax return.

6. Although Valdez testified that he lacked any personal recollection of signing the 1993 tax return, Valdez does acknowledge that he paid a substantial amount of taxes on behalf of the Estate as reflected in the Account for Final Settlement.

We are mindful that the standard of review in this case is one of abuse of discretion. Looking at the probate court's findings and the evidence in the record, we find no abuse of discretion by the probate court in linking Valdez to the preparation and filing of the 1993 tax return. There is evidence to support the trial court's findings, and the probate court, within its discretion, could conclude that the fact that Valdez did not disclose the bank accounts in the verified inventory, but did give Young the information relating to the bank accounts so that such information could be included in the 1993 tax return for the Estate, supports the inference that Valdez concealed a material fact and did not make full disclosure as a fiduciary. And, his failure to disclose the bank accounts prevented the heirs from knowing about their legal rights and making a claim.

B. *Did the heirs fail to diligently pursue their legal remedies and thus are not entitled to equitable relief?*

Both Fidelity and Valdez argue that because the heirs failed to diligently pursue their legal remedies, they are not entitled to equitable relief. As noted previously, a petitioner in a bill of review must show that he exercised due diligence in prosecuting all adequate legal remedies with respect to the underlying judgment or order. *King Ranch*, 118 S.W.3d at 751. Thus, a

> bill of review is proper where a party has exercised due diligence to prosecute all adequate legal remedies against a former judgment, and at the time the bill of review is filed, there remains no such adequate legal remedy still available because, through no fault of the bill's proponent, fraud, accident or mistake precludes presentation of a meritorious claim or defense.

*Id.* Fidelity emphasizes that because an equitable bill of review is a remedy in equity, in order to be entitled to pursue an equitable remedy, the heirs had to show that they were prevented from pursuing other legal remedies available to them. Here, the probate court found that the heirs

> had no adequate legal remedy available to avoid the effect of the erroneous Judgments/Orders in the Estate case (the 1994 Proceeding) since they did not acquire actual knowledge of Robert A. Valdez's failure to disclose the true value of the Estate of Pierre V. Bernard, until well after the time for filing a Motion for

New Trial or a Review for Writ of Error. A bill of review was the only recourse available to said Petitioners.

Both Fidelity and Valdez claim that the heirs could have brought a statutory bill of review proceeding. Fidelity notes that with respect to a statutory bill of review proceeding, the heirs were required to file their bill of review within two years of the date they learned there were other potential assets in the Bernard Estate. Fidelity claims that the heirs learned of other potential assets in the Estate in March and April 2003 when they received notification from Rishebarger. Fidelity emphasizes that the heirs did not file their statutory bill of review within the two years and thus argues that because the heirs had the legal remedy of filing a statutory bill of review and failed to pursue it, they are not as a matter of law entitled to an equitable bill of review. Therefore, Fidelity argues that the probate court erred in its Finding of Fact No. 36 that the heirs "had no adequate legal remedy . . . to avoid the effect of the erroneous Judgments/Orders in the Estate case (1994 Proceeding) . . .[and that] a bill of review was the only recourse available to said Petitioners."

According to Fidelity, even after being notified by Rishebarger in March and April 2003 that the Bernard Estate had been victimized and had assets stolen, the heirs did nothing. Fidelity contends that there was nothing to prevent the heirs from reviewing the probate court's file, from asking to see the tax returns or any of Valdez's file, or from otherwise participating in the administration of the estate. "They chose not to do so as a matter of convenience, not because they were fraudulently prevented from doing so." "Nothing prevented the heirs from filing a statutory bill of review proceeding between October 1996 and April 2005, even though they were aware that the Bernard Estate had been victimized."

In response, Hollenbeck argues that a statutory bill of review pursuant to section 31 of the Probate Code was not available to the heirs because to be entitled to such relief, the heirs would

have had to show substantial error by the probate court. *See Estate of Jones*, 286 S.W.3d 98, 100 (Tex. App.—Dallas 2009, no pet.). Indeed, the "purpose of a section 31 [statutory] bill of review is to revise and correct errors, not merely to set aside decisions, orders, or judgments rendered by the probate court." *Buck v. Estate of Buck*, 291 S.W.3d 46, 52 (Tex. App.—Corpus Christi 2009, no pet.) (quoting *Nadolney v. Taub*, 116 S.W.3d 273, 278 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)) (alteration in original). Thus, to prevail on a statutory bill of review, a petitioner must "allege and prove the trial judge committed substantial error." *Nadolney*, 116 S.W.3d at 278. Hollenbeck contends that the record is "completely void of any evidence that the probate court committed any error (yet alone substantial error) that would have entitled" the heirs to a statutory bill of review under section 31. We agree with Hollenbeck. In reviewing this record, we find no substantial error by the probate court that would have allowed the heirs to succeed in a statutory bill of review proceeding. Therefore, we reject the argument that the heirs did not diligently pursue their legal remedies.

### C. Did the heirs allege a meritorious cause of action?

To be entitled to a bill of review, the heirs were required to allege a meritorious cause of action. *See King Ranch*, 118 S.W.2d at 751. The probate court found the heirs had a "meritorious claim in that they are the rightful heirs of Pierre V. Bernard who have been deprived of the full value of their inheritance." Fidelity and Hollenbeck argue that "simply alleging that they were deprived of their rightful inheritance is not a cause of action." However, Fidelity and Hollenbeck ignore that the equitable bill of review sought to vacate the Final Order of Settlement on the Bernard Estate. In *McDaniel v. Hale*, 893 S.W.2d 652, 666–67 (Tex. App.—Amarillo 1994, writ denied), after examining the progression of the law with respect to equitable bills of review, the Amarillo Court of Appeals concluded that a "meritorious claim" encompasses more than just a cause of action, and can include a ground on appeal calling for the modification of a judgment:

Upon review of the several cases touching the question of whether a ground of appeal that merely calls for a modification of a judgment is meritorious for bill of review purposes, we conclude that such a ground is indeed meritorious. A bill of review is, after all, an equitable proceeding and it occurs to us that there is nothing equitable about precluding a party from challenging the amount of a judgment against it where such party was denied the right to make such a challenge by motion for new trial or appeal. We therefore hold that a meritorious ground of appeal means a meritorious claim, whether that claim be a meritorious defense to the cause of action alleged to support the judgment or merely a meritorious basis for modification of the judgment in some respect.

*Id.*; *see also Thompson v. Ballard*, 149 S.W.3d 161, 165 (Tex. App.—Tyler 2004, no pet.) (explaining that a meritorious claim includes a meritorious ground of appeal, which can include a meritorious ground for the modification of a judgment). Here, that the heirs were deprived the full value of their inheritance is a meritorious ground for modifying the 1996 Probate Orders, in which the probate court approved the final distribution amounts, and discharged Valdez and the surety. Thus, the probate court did not abuse its discretion in finding that the heirs had shown a meritorious claim.

## TRIAL ON THE MERITS

A. *With regard to the trial on the merits, did the probate court err in granting judgment because Hollenbeck failed to prove that the breach of any fiduciary duty by Valdez was the proximate cause of damages to the Bernard Estate?*

Fidelity and Valdez argue that Hollenbeck failed to prove that the breach of a fiduciary duty by Valdez was the proximate cause of damages to the Bernard Estate. They point out that the damages awarded to Hollenbeck on behalf of the Bernard Estate in the judgment are identical to the amount that Spillman stole from the Estate, less the amount distributed by the receiver in 2009. According to Fidelity, there is "no evidence in the record that Valdez had any knowledge of Spillman's criminal activities nor is there any evidence in the record that even if" Valdez had discovered Spillman's criminal activity, Valdez would have been able to recover any money or been able to distribute any more money to the heirs than the heirs actually received.

With respect to Hollenbeck's breach of fiduciary claim, the probate court made the following findings:

(1) The following elements must be met for a party to establish a claim for breach of fiduciary duty; (1) there must exist a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant.

(2) An Estate Representative maintains a fiduciary duty to the heirs of the Estate as a matter of law.

(3) Defendant, Robert A. Valdez, concedes the existence of his fiduciary relationship with Plaintiffs;

(4) Defendant, Robert A. Valdez, acknowledges that the Texas Probate Code prescribed the non-delegable duties upon an estate representative.

(5) Defendant, Robert A. Valdez, concedes through his testimony that the Inventory and Appraisement that he filed in the Estate of Pierre V. Bernard, Deceased, was not complete.

(6) Defendant, Robert A. Valdez, testified that he understands that the information contained in an inventory is material information not only to the court, but to the heirs and creditors of an estate.

(7) Defendant, Robert A. Valdez, testified that the reason estate representatives are required to verify inventories and accounts is to give assurances to heirs and creditors and to the court that the information is accurate.

(8) Defendant, Robert A. Valdez, testified that heirs and creditors rely upon estate representatives when they verify the accuracy of accounts.

(9) Defendant, Robert A. Valdez, acknowledged through his testimony that the 1993 U.S. Individual Tax Return filed on behalf of Pierre V. Bernard, Deceased, includes accounts with financial institutions that are not reflected in the Inventory and Appraisement he filed on behalf of the Estate of Pierre V. Bernard.

(10) The great weight and preponderance of the evidence shows that Defendant, Robert A. Valdez, breached his fiduciary duty to the heirs of the Estate of Pierre V. Bernard by failing to fully disclose and account for the assets of the Estate of Pierre V. Bernard and disburse said assets to the rightful heirs.

(11) The great weight and preponderance of the evidence shows that the heirs of the Estate of Pierre V. Bernard sustained damages that were proximately caused by the breach of fiduciary duty committed by Defendant, Robert A. Valdez.

(12)     Edward L. Rishebarger summarized the damages incurred by Petitioner in Trial Exhibits 8 and 10. The Court is satisfied that Edward L. Rishebarger's undisputed testimony of Petitioner's damages is accurate in the amounts as follows:

  a.  The total value of the Estate of Pierre V. Bernard at the time of death was in the amount of $698,319.08.

  b.  The amount of expenses and disbursements made by Robert A. Valdez was in the amount of $175,484.29.

  c.  The amount misappropriated from the Estate of Pierre V. Bernard is in the amount of $522,834.79.

  d.  The amount disbursed by Edward L. Rishebarger to the heirs of the Estate of Pierre V. Bernard, Deceased, was in the amount of $56,878.00

  e.  resulting in actual damages to the heirs of the Estate of Pierre V. Bernard, Deceased, in the amount of $465,956.79, as reflected in the Judgment.

(13)     As a direct and proximate cause of the breach of fiduciary duty of Defendant Valdez, and after offsetting the amount recovered by the Estate of Pierre V. Bernard from the Receiver, the actual damages incurred by Petitioner are in the amount of $465,956.79.

The probate court also made the following conclusions of law:

(1) An estate representative is held to the same high fiduciary duties and standards in the administration of a decedent's estate that are applicable to trustees.

(2) The fiduciary duties owed to the beneficiaries of an estate include a duty of full disclosure of all material facts known to the Estate representative that might affect the beneficiaries' rights.

(3) It is the statutory duty of the administrator of an estate of a deceased person to recover possession of and hold such estate in trust to be disposed of in accordance with law. It is as much the administrator's duty to withhold the estate from one not lawfully entitled to receive it as it is his duty to surrender the estate, when the administration is closed, to those entitled thereto.

(4) Once assets are traced to a fiduciary, a presumption arises that those assets were in his possession and the burden shifts to the fiduciary to account for the assets. When a fiduciary fails to file proper inventories and accounts, the burden is on the fiduciary to show validity of deductions from assets.

(5) Once funds are traced into the administrator's possession, he is presumed to possess the entire amount traced and it becomes his burden to show he is not in possession of all or part of the traced amount.

Fidelity and Valdez claim that under section 233 of the Probate Code, *in connection with funds stolen by a third party prior to the appointment by Valdez as administrator*, Hollenbeck was required to prove that (1) Valdez *willfully neglected to use ordinary diligence* to both discover and record the stolen funds; and (2) that *such failure was the proximate cause of damages* to the Estate.

Section 233 of the Probate Code provides the following:

### § 233 Collection of Claims and Recovery of Property

(a)  Every personal representative of an estate shall use ordinary diligence to collect all claims and debts due the estate and *to recover possession of all property of the estate* to which its owners have claim or title, provided there is a reasonable prospect of collecting such claims or of recovering such property. If he willfully neglects to use such diligence, he and the sureties on his bond shall be liable, at the suit of any person interested in the estate, for the use of the estate, for the amount of such claims or the value of such property as has been lost by such neglect.

TEX. PROB. CODE ANN. § 233(a) (West 2003) (emphasis added). The crux of Valdez's and Fidelity's argument is that Valdez was not in possession of the bank accounts at issue and that Spillman had "stolen" them before Valdez ever had an opportunity to gain possession. The probate court, however, found that the funds in the bank accounts could be traced into Valdez's possession and that once they were traced to his possession, he was presumed to possess the entire amount traced, and the burden then shifted to Valdez to show he was not in possession of all or part of the traced amount.

The evidence shows that on February 23, 1994, Valdez was appointed as administrator. Rishebarger testified in his deposition (which was admitted at trial) about the funds missing from the Bernard Estate. With regard to the bank accounts that were not included in Valdez's inventory (Broadway Bank; IBC; Security National; and Eisenhower National), Rishebarger testified to the following:

Q:     So this – that Waddle & Reed account was opened by someone after Pierre Bernard's death?

A:     That's correct.

Q:     Okay. And were you able to ascertain who that was?

A:     Well, they were opened in Mel Spillman's name.

Q:     All right. Was there anyone else on those accounts besides Mel Spillman?

A:     No.

Q:     The – and then it makes reference to a balance to Spillman's Union Account. What is that?

A:     It was – the account – if you look over here on the right, you'll see balance to Spill – these are all Mel Spillman's accounts. In other words, that money was moved from one account, from the Bernard account, into Spillman's account.

Q:     Okay. And do they correspond directly across, like the $20,600 was moved from a NationsBank account?

A:     Right.

Q:     I see. And then out of the second NationsBank account the full balance was moved into the SACU Spillman account?

A:     Right.

Q:     Am I reading that correctly?

A:     That's correct.

Q:     Okay. So ultimately the vast majority of this money was moved out of the Bernard estate over into accounts in the name of Mel Spillman?

A:     That's correct.

Q:     All right. Could you tell when that was done?

A:     Yes. There's another schedule that details when these were done. Most of them were in '94 or '95.

Q:     Okay.

A:     In that time frame.

Q:     Could we find that schedule?

A:     Yeah. The NationsBank was done in February '95, the first account. The second account was moved in April of 1994. The International Bank of Commerce in March of 1994. The SACU was done over a period of two years from March of '94 to June of '96. Security National Bank was March of '94. Bank of America was between March and May of '94. The First Interstate was done between March of '94 and July of '96. Jefferson Bank was March of '94. Eisenhower was March of '94. Broadway was March of '94. Guaranty Federal was March of '94. Bank of the West was March of '94. And Frost was April of '94 to April of '95.

Rishebarger performed an analysis of Bernard's assets at the time of his death, compared his calculations to the inventory filed by Valdez and concluded that the estate had been undervalued by $438,319 (the inventory listed some of the amounts in the bank accounts incorrectly – for example, the inventory said there was $25,000 in the Jefferson State Bank

Account when in fact there was $100,000). Rishebarger concluded that Spillman stole the following:

(1) $20,600 from the NationsBank account;

(2) $121,229.43 from the SACU account;

(3) $239,396.99 out of the Bank of America account;

(4) $141,608.37 out of Frost Bank;

(5) the Bank of America account was opened later and the monies came from Eisenhower, Broadway, and Guaranty accounts; $314,726.30 was deposited into the Bank of America in Mel Spillman's name.

Thus, in comparing the transfer dates above with the accounts from which Spillman stole funds, all the funds were in existence in the bank accounts at the time Valdez was appointed.

The probate court found it significant that the funds were actually in the bank accounts at the time Valdez was appointed and that Spillman did not begin the transfer of funds out of the accounts until after Valdez's appointment. As explained previously, the probate court also tied Valdez to the bank accounts through information contained in the 1993 tax return. Thus, Hollenbeck argues that there is evidence of constructive or actual possession of the funds by Valdez. According to Hollenbeck, Valdez did not need to "pursue" stolen assets from Spillman but only needed to retrieve them from the various bank accounts that were holding them in Pierre V. Bernard's name. Therefore, Hollenbeck argues that section 233's willful negligence standard does not apply. We agree with Hollenbeck that the willful negligence standard does not apply. Instead, the presumption found by the probate court applies: Once assets are traced into the administrator's possession, he is presumed to possess the entire amount traced, and it becomes his burden to show he is not in possession of all or part of the traced amount. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *Cross v. Old Rep. Surety Co.*, 983 S.W.2d 771, 776 (Tex. App.—San Antonio 1998, pet. denied). "If the administrator fails to carry

this burden, he breaches the condition of his bond to well and truly perform his duties as administrator, and his surety becomes liable to the estate for the misappropriated funds up to the face amount of the bond." *Cross*, 983 S.W.2d at 776.

With regard to proximate cause, Hollenbeck argues that Fidelity and Valdez "mistakenly assert that [he] needed to prove Valdez would have been able to recover any monies from Mel Spillman." "It appears that this error is premised on the mistaken assumption that none of the assets remained in Pierre V. Bernard's name during a time in which Valdez was the estate representative and that Valdez did not know of the existence of the assets." Hollenbeck points out that there is evidence the funds were in the accounts at a time in which Valdez was administrator of the estate, that there is evidence of Valdez's knowledge of these bank accounts (as shown though the 1993 tax return and the evidence linking him to it). According to Hollenbeck, Valdez's "failure to gather these assets, secure these assets, account for these assets and ultimately disburse the assets to the rightful owners were each separate proximate causes of the damages incurred by" Hollenbeck as representative of the estate. We agree with Hollenbeck and find no error by the probate court.

B. *Did the probate court err in awarding judgment against Fidelity in an amount excess of its $260,000 bond?*

Fidelity points out that in addition to damages of $260,000 (the amount of the bond), the probate court awarded judgment to Hollenbeck against Fidelity for an additional sum of $78,035.62 in pre-judgment interest. According to Fidelity, the probate court erred in awarding judgment against Fidelity in an amount in excess of the bond. The probate court made the following conclusion of law:

> A surety that issued an administrator's bond can be required to pay prejudgment interest over and above the face amount of the bond. *See Northwestern Nat'l Cas. Co. v. Doucette*, 817 S.W.2d 396, 399-400 (Tex. App.—Fort Worth 1991, writ denied) (citing *Howze v. Surety Corp. of Am.*, 584 S.W.2d 263, 268 (Tex. 1979));

*Cross v. Old Rep. Surety Co.*, 983 S.W.2d 771, 778 (Tex. App.—San Antonio 1998, pet. denied).

In support of its argument that the probate court erred in awarding pre-judgment interest because the total amount awarded exceeded the amount of the bond, Fidelity points to *West v. Triple B. Services, LLP*, 264 S.W.3d 440 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The court in *Triple B.* analyzed the intent of section 53.156 of the Texas Property Code, which governs bonds to indemnify against a lien, and considered whether section 53.156 shows a legislative intent to permit a recovery against a surety on an indemnity bond exceeding the face amount of the bond. *Id.* at 453. Section 53.156, however, is not at issue in the instant case. The court in *Triple B.* also discussed "the well-settled rule that a surety's liability *generally* is limited to the face amount of the bond." *Id.* (citing *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995)) (emphasis added). The court noted that this general rule "has been applied in a variety of contexts" and concluded that there was no compelling reason "why the indemnity bond at issue should be treated differently than the many other types of bonds to which the rule has been applied." *Id.* at 453–54.

The case upon which *Triple B.* relied for the "general rule" is *Great American Insurance Co. v. North Austin Municipal Utility District No. 1*, 908 S.W.2d 415 (Tex. 1995). *Great American* concerned the duties and liabilities of "a commercial surety to its bond obligee." *Id.* at 416. In determining the extent of the surety's liability in excess of the face value of the bond, the supreme court noted that "[i]t is well settled that a performance bond is enforceable only to the extent of the obligee's actual damages." *Id.* at 426. "Likewise, when an obligee's actual damages exceed the penal amount of the bond, a surety's liability generally is limited to the penal sum of the bond." *Id.* The court noted that the "specific terms of the performance bond in this case limit [the municipal utility district]'s total recovery, including 'cost and other damages,' to the total

amount of $397,503.20." *Id.* at 426–27. The court thus concluded that the surety was not liable for the municipal utility district's actual damages caused by its principal's breach in excess of $397,503.20, the face value of the bond. *Id.* at 427. Hollenbeck emphasizes while this holding seems to support Valdez and Fidelity's argument, it actually supports his argument. Hollenbeck notes that even after this holding, the supreme court still remanded the case to the trial court for further proceedings, "including a determination regarding prejudgment interest." *Id.* at 428–29. According to Hollenbeck, if the trial court could not award prejudgment interest in excess of the face amount of the bond, why would the supreme court have remanded the case for such a determination? We agree with Hollenbeck.

Indeed, the supreme court remanding for entry of prejudgment interest in excess of the face amount of the bond is consistent with its precedent. For example, in its original opinion in *Howze v. Surety Corp. of America*, 584 S.W.2d 263, 268 (Tex. 1979), the supreme court held that the surety was liable only for the face amount of the bond. However, on rehearing, the court reformed the judgment to include an award of prejudgment interest against the surety (even though the judgment against the surety was for the face amount of the bond). *Id.* (opinion on reh'g). In *Northwestern National Casualty Co. v. Doucette*, 817 S.W.2d 396, 399-400 (Tex. App.—Fort Worth 1991, writ denied), the Fort Worth Court of Appeals criticized a party for relying on *Howze* for the proposition that a surety could not be held liable for prejudgment interest above the face amount of the bond. In *Doucette*, the court addressed the issue of whether a probate court erred in awarding judgment against a surety that issued a bond in the amount of $100,000 to the administratrix of an estate for prejudgment interest in an amount in excess of the bond. *Id.* at 399. The court noted that the surety argued that its total liability must be limited to the face amount of the bond and relied on *Howze* for the proposition. *Id.* The court explained that the surety's reliance on *Howze* was "misplaced because on motion for rehearing in that case, the

court awarded prejudgment interest against the surety in addition to the recovery for the face amount of the bond." *Id*. at 399-400.

Similarly, this court in *Cross*, 983 S.W.2d at 776, explained that a surety is liable for prejudgment interest above the face amount of the bond:

> [O]nce assets are traced into the administrator's possession, he is presumed to possess the entire amount traced, and it becomes his burden to show he is not in possession of all or part of the traced amount. If the administrator fails to carry this burden, he breaches the condition of his bond to well and truly perform his duties as administrator, and his surety becomes liable to the estate for the misappropriated funds up to the face amount of the bond. If a surety is held liable on its bond, *it is also liable for prejudgment interest commencing on the date demand was made. Howze v. Surety Corp. of Am.*, 584 S.W.2d 263, 268 (Tex. 1979); *Ward v. Maryland Cas. Co.*, 140 Tex. 124, 166 S.W.2d 117, 120 (1942).

*Id.* (emphasis added) (some quotations omitted).

We therefore find no error on the part of the trial court in awarding prejudgment interest against Fidelity.

#### CONCLUSION

Having found no error on the part of the probate court, we affirm the judgment.

Karen Angelini, Justice